**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:08cv291**

| | | |
|---|---|---|
| **IRWIN INDUSTRIAL TOOL COMPANY,** )<br>**d/b/a BernzOmatic and NEWELL** )<br>**OPERATING COMPANY,** )<br>)<br>**Plaintiffs,** )<br>)<br>)<br>**vs.** )<br>)<br>)<br>**WORTHINGTON CYLINDERS** )<br>**WISCONSIN, LLC, WORTHINGTON** )<br>**CYLINDER CORPORATION, and** )<br>**WORTHINGTON INDUSTRIES, INC.,** )<br>)<br>**Defendants.** )<br>————————————————— ) | | **MEMORANDUM OF<br>DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Defendants' Motion to Dismiss [Doc. 10]; the Plaintiffs' Motion to Dismiss Defendants' Counterclaims [Doc. 25]; and the Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaims [Doc. 42].

## I.  PROCEDURAL BACKGROUND

On June 25, 2008, the Plaintiffs Irwin Industrial Tool Company, d/b/a BernzOmatic and Newell Operating Company (collectively "BernzOmatic")

filed this action against the Defendants Worthington Cylinders Wisconsin, LLC, Worthington Cylinder Corporation, and Worthington Industries, Inc. (collectively "Worthington"). In Counts I, II, III, and IV of the Complaint, BernzOmatic alleges various claims arising from Worthington's purported breach of the parties' contract ("Supply Agreement"). Worthington does not seek dismissal of these claims, and therefore, these claims are not discussed any further here. In the remaining counts of the Complaint, BernzOmatic asserts claims for false designation of origin and false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count V); unfair and deceptive trade practices, in violation of N.C. Gen. Stat. §§ 75-1.1, et seq. (Count VI); tortious interference with prospective business relations in violation of North Carolina law (Count VII); and unlawful price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13 (Count VIII). [Doc. 1].

On August 4, 2008, Worthington filed a Motion to Dismiss Counts V through VIII of BernzOmatic's Complaint [Doc. 10], as well as an Answer and Counterclaim denying BernzOmatic's allegations and asserting counterclaims for fraudulent inducement and breach of contract. [Doc. 14]. On August 27, 2008, BernzOmatic responded to Worthington's Motion to Dismiss [Doc. 27] and filed a Motion to Dismiss Defendants' Counterclaims [Doc. 25]. After

receiving extensions of time to do so, Worthington filed a Reply in support of its Motion to Dismiss on September 18, 2008 [Doc. 34] and a Response to BernzOmatic's Motion to Dismiss on September 22, 2008 [Doc. 36]. Worthington's Response to BernzOmatic's Motion to Dismiss addressed the merits of only the breach of contract claim. With respect to its claim for fraudulent inducement, Worthington filed an Amended Answer and Counterclaim, asserting additional factual allegations. [Doc. 35]. The filing of this Amended Answer and Counterclaim prompted BernzOmatic to file another Motion to Dismiss, specifically directed to the amended fraudulent inducement claim, on October 8, 2008. [Doc. 42].

By leave of Court, Worthington filed a Surreply in support of its Motion to Dismiss on October 10, 2008 [Doc. 44-2], and BernzOmatic filed a "Final Reply" in response on October 15, 2008 [Doc. 47-2]. Worthington filed a Response to BernzOmatic's second Motion to Dismiss on October 27, 2008 [Doc. 48], and BernzOmatic filed a Reply to this Response on November 10, 2008 [Doc. 50].

Having been fully briefed, these motions are now ripe for disposition.

## II.	DEFENDANTS' MOTION TO DISMISS

### A.	Applicable Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that the complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so that the defendant may have "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A defendant may challenge the legal sufficiency of a complaint by way of a Rule 12(b)(6) motion. See Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). In reviewing such a motion, the Court must assume the facts alleged in the complaint to be true. Eastern Shore Markets, Inc. v. J.D. Associates Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000). While all well-pleaded factual allegations must be taken as true, the Court "need not accept the legal conclusions drawn from the facts," or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." Id.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Id.</u> at 1965 (citations and footnote omitted).

## B.    Factual Allegations

Taking the allegations as set forth in the Complaint as true, the following are the relevant facts for the purpose of the Defendants' Motion to Dismiss. The Plaintiff Irwin Industrial Tool Company, d/b/a BernzOmatic, is a Delaware corporation with its principal place of business in Huntersville, North Carolina. It manufactures and markets a wide variety of tools, including hand torches and other gas combustion devices. [Doc. 1 at ¶2]. The Plaintiff Newell Operating Company is a Delaware corporation and is the holder of certain trademark registrations for BERNZOMATIC®. [<u>Id.</u> at ¶3]. The Plaintiffs shall be referred to collectively throughout this opinion as "BernzOmatic."

The Defendant Worthington Cylinders Wisconsin, LLC is an Ohio limited liability company with its principal place of business in Chilton, Wisconsin. It is a subsidiary of the Defendant Worthington Cylinder Corporation, an Ohio

corporation with its principal place of business in Columbus, Ohio. Worthington Cylinder Corp., in turn, is a subsidiary of Worthington Industries, Inc., an Ohio corporation with its principal place of business in Columbus, Ohio. [Id. at ¶4]. The Defendants shall be referred to collectively throughout this opinion as "Worthington."

During the 1950's, BernzOmatic developed a commercial one-pound hand torch that was portable and easy to use. [Id. at ¶¶7, 8]. Since that time, BernzOmatic has been the market leader in consumer hand torches and hand torch cylinders. [Id. at ¶8]. As early as 1954, BERNZOMATIC® has been a registered trademark, which BernzOmatic has used exclusively in connection with its gas cylinders and related goods. [Id. at ¶¶9, 10]. BernzOmatic is well known to consumers of such goods and has come to be recognized as the single source for BernzOmatic products through decades of distribution, sales and advertising to customers throughout the United States. BernzOmatic has invested enormous amounts of time, money, and resources building its reputation and developing the BernzOmatic brand. The BernzOmatic trade dress, including the recognizable color of its hand torch cylinders, is well known to BernzOmatic's customers. [Id. at ¶10].

For over twenty years, Worthington's predecessor, Western Industries, supplied BernzOmatic with hand torch cylinders, which BernzOmatic then sold under the BernzOmatic brand. [Id. at ¶11]. Worthington acquired Western Industries in 2004 and assumed the rights and obligations of Western Industries under the supply agreement then existing between Western Industries and BernzOmatic. [Doc. 35, Counterclaim at ¶1]. Under that supply agreement, Worthington agreed to supply BernzOmatic's requirements for certain specified hand torch cylinders at set prices; BernzOmatic was the sole outlet for the specified cylinders supplied by Worthington; and BernzOmatic had the exclusive right to sell such cylinders to all distributors and retailers. [Doc. 1 at ¶12].

In the summer of 2005, BernzOmatic and Worthington negotiated and entered into a new Supply Agreement, which was effective as of January 1, 2006 and continued through December 31, 2008. [Id. at ¶13; Doc. 13, filed under seal].[1] Pursuant to the terms of the Supply Agreement, Worthington

---

[1] While the Complaint states that a copy of the Supply Agreement is attached as an exhibit, no such exhibit apparently was filed. Worthington has attached a copy of the Supply Agreement as an exhibit in support of its Motion to Dismiss. [Doc. 13, filed under seal]. Because BernzOmatic repeatedly references the Supply Agreement in the Complaint and the authenticity of the Supply Agreement is not contested, the Court may consider the Supply Agreement in ruling on Worthington's Motion to Dismiss without converting this motion into one for summary judgment. See Clark v. BASF Salaried Employees' Pension Plan, 329 F.Supp.2d 694, 699 (W.D.N.C. 2004), aff'd, 142 Fed. Appx. 659 (4th Cir. 2005).

agreed to supply BernzOmatic's requirements worldwide for "Covered Cylinders." [Doc. 13 at 2-3, §2.1]. The term "Covered Cylinders" is defined in Section 1.2 of the Supply Agreement as follows:

> "Covered Cylinder" shall mean a filled or unfilled cylinder of the type currently being purchased by BernzOmatic from [Worthington] having an internal volume of approximately 62 cubic inches, and . . . any other cylinders having an internal volume of greater than 40 but less than 70 cubic inches which may in the future be used by BernzOmatic for the same or a similar purpose.

[Doc. 13 at 1, §1.2]. Section 2.2 of the Supply Agreement (the "exclusivity provisions") provides that BernzOmatic has the exclusive right to sell the Covered Cylinders to "Retail Mass Merchants," also referred to as "BernzOmatic Distribution Customers," and that Worthington has the exclusive right to sell Covered Cylinders to certain "Direct Account Customers," which are specified in an exhibit to the Supply Agreement. [Id. at 3, §2.2, Ex. B]. Section 7.1 of the Supply Agreement provides that Worthington can terminate these exclusivity provisions if BernzOmatic purchased fewer than 14,250,000 Covered Cylinders in a twelve-month period. [Doc. 1 at ¶14; Doc. 13 at 10, §7.1].

In January 2007, Worthington notified BernzOmatic that it intended to terminate the exclusivity provisions of the Supply Agreement because

BernzOmatic had purchased fewer than 14,250,000 cylinders in 2006. Worthington further claimed that BernzOmatic's acquisition of a company named Ultra Blue Technologies Inc. ("Ultra Blue") one year earlier and its sale of Ultra Blue's PowerCell™ ("PowerCell") products were not acts of good faith under the Supply Agreement, and that it considered BernzOmatic's sales of PowerCell products to be directly competitive with its sales of Worthington's cylinders. [Id. at ¶¶17, 19]. While BernzOmatic did not contest Worthington's right to terminate BernzOmatic's exclusivity rights under the Supply Agreement, it pointed out in a letter to Worthington dated January 10, 2007 that Worthington's exclusivity rights were simultaneously terminated effective immediately. BernzOmatic further asserted that there had been no breach of the Supply Agreement because the PowerCell cylinders were smaller than 40 cubic inches and therefore were not Covered Cylinders within the meaning of the Supply Agreement. [Id. at ¶18].

On January 29, 2007, Worthington gave notice of its termination of the entire Supply Agreement effective March 1, 2007, on account of the purported breach by BernzOmatic arising from the sale of PowerCell products. [Id. at ¶19]. BernzOmatic alleges that Worthington knew at the time of this termination that BernzOmatic's sale of PowerCell products did not breach the

Supply Agreement and was not directly competitive with its sales of Worthington cylinders; in fact, BernzOmatic alleges, Worthington had known about such sales for a year prior to ever raising it as an issue. It is BernzOmatic's contention that Worthington raised the PowerCell issue as a pretext for terminating the Supply Agreement so that Worthington could (1) jettison the pricing formula in the Supply Agreement and impose significant price increases upon BernzOmatic and (2) sell Covered Cylinders directly to retail mass merchants and others and compete unfairly with and exclude BernzOmatic from these customers and the market. [Id. at ¶19].

Following Worthington's purported termination of the Supply Agreement, Worthington refused to honor the prices set forth in the Supply Agreement and began to sell cylinders to BernzOmatic at dramatically increased prices, knowing that BernzOmatic had no alternative sources for such cylinders and thus had no choice but to pay the increased prices. [Id. at ¶22]. Worthington's termination of the Supply Agreement immediately disrupted BernzOmatic's ability to supply its customers. [Id. at ¶27]. Eventually, BernzOmatic was able to find an alternative supplier, but only at prices "far above" those to which BernzOmatic was entitled under the Supply Agreement. [Id. at ¶22].

After terminating the Supply Agreement, Worthington began manufacturing and selling its own hand torch cylinders, in direct competition with BernzOmatic. These hand torch cylinders were substantially similar to the product that Worthington previously sold to BernzOmatic. These hand torch cylinders also used the same trade dress as that used by BernzOmatic for several years, including the use of a distinctive blue color for propane cylinders and yellow for MAPP gas cylinders. [Id. at ¶28]. Worthington sold such hand torch cylinders to favored purchasers who were competitors of BernzOmatic. [Id. at ¶29].

After terminating the Supply Agreement, Worthington began an advertising campaign that used the BernzOmatic trade name, trademark, logo and trade dress in what BernzOmatic claims is a disparaging manner. [Id. at ¶30]. The advertisement at issue depicts a hand tearing away a BernzOmatic label on its hand torch cylinder, revealing a Worthington label underneath. The advertising tells the consumer to "Uncover the name you've trusted all along" and states "All the quality you've come to expect in hand torch cylinders is now available direct from the source." [Doc. 27-3].[2]

_____

[2]Like the Supply Agreement, a copy of this print ad was purportedly attached to the Complaint but does not appear in the record as such. BernzOmatic did, however, attach a copy of the advertisement as an exhibit in support of its Motion to Dismiss. [Doc. 27-3]. Because BernzOmatic repeatedly references the print advertisement in the

## C.    Analysis

Worthington moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss BernzOmatic's claims for violation of the Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count V), tortious interference with prospective business relations (Count VII), violation of the Robinson-Patman Act, 15 U.S.C. § 13(a) (Count VIII), and unfair competition and deceptive trade practices, N.C. Gen. Stat. § 75-1.1 (Count VI).  [Doc. 10]. The Court will address each of these claims in turn.

### 1.    Lanham Act Claims

BernzOmatic alleges that Worthington's advertising campaign contains false and misleading descriptions and representations of fact which (1) "misrepresent[] the nature, characteristics, [and] qualities of Worthington's and BernzOmatic's goods" and (2) "are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Worthington with BernzOmatic, or as to the origin, sponsorship, or approval of Worthington's and BernzOmatic's goods" in violation of Section 43(a) of the Lanham Act.  [Doc. 1 at ¶¶68, 69].  Specifically, BernzOmatic alleges in its Complaint that Worthington's 2007 advertising campaign "falsely states or

_____

Complaint and the authenticity of the advertisement is not contested, the Court will consider the advertisement in ruling on Worthington's Motion to Dismiss.

implies, among other things, that consumers have not trusted and should not trust BERNZOMATIC®, that consumers have actually been purchasing a Worthington product when they thought they were purchasing a BERNZOMATIC® product, and that BERNZOMATIC® is not the brand they have grown to trust." [Doc. 1 at ¶67]. Worthington argues that BernzOmatic has failed to state a claim under the Lanham Act because BernzOmatic has not identified any false or misleading representations in Worthington's advertisements. [Doc. 11 at 14-18].

### a. False Advertising

Section 43(a)(1)(B) of the Lanham Act prohibits the "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). A plaintiff asserting a false advertising claim under Section 43(a)(1)(B) must demonstrate that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the

> tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

Scotts Co. v. United Industries Corp., 315 F.3d 264, 272 (4th Cir. 2002) (quoting Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002)). To give rise to a claim under the Lanham Act, the subject statement "must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." Scotts, 315 F.3d at 272-73 (quoting C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P., 131 F.3d 430, 434 (4th Cir. 1997)).

BernzOmatic first asserts that Worthington's advertisement falsely states and/or implies that consumers have not trusted and should not trust the BernzOmatic brand. [Doc. 1 at ¶67]. BernzOmatic, however, has not identified anything in Worthington's advertisement which explicitly represents that consumers have not trusted BernzOmatic or that consumers should not trust the BernzOmatic brand, nor can such a representation reasonably be implied from the language of the advertisement. If anything, the advertisement implies the opposite: that BernzOmatic is a brand that has

been, and should be, trusted by consumers (and, because Worthington is the "source" of BernzOmatic cylinders, that Worthington should be trusted as well). Thus, to the extent that BernzOmatic claims that Worthington's advertisement states or implies that consumers have not or should not trust the BernzOmatic brand, this allegation fails to state a claim for false advertising.

BernzOmatic further asserts that Worthington's advertisement falsely states and/or implies that consumers actually have been purchasing a Worthington product when they thought they were purchasing a BernzOmatic product. [Id. at ¶67]. Worthington contends that this statement is neither false nor misleading, because BernzOmatic admits in its own allegations that Worthington or its predecessor, Western Industries, supplied BernzOmatic with the hand torch cylinders that BernzOmatic sold under the BernzOmatic brand for over twenty years. Because the statements regarding the source of BernzOmatic cylinders are literally true, Worthington contends, the statements made in its advertisement are not actionable under the Section 43(a)(1)(B) of the Lanham Act. [Doc. 11 at 16-17].

Worthington's advertisement invites consumers to "[u]ncover the name you've trusted *all along*" and represents that the quality that consumers have

"come to expect" in BernzOmatic cylinders "is now available direct from *the source*." [Doc. 27-3] (emphasis added). Drawing all reasonable inferences in BernzOmatic's favor, these statements reasonably could be read to imply that Worthington has been the sole source of BernzOmatic hand torch cylinders for the *entire time* that BernzOmatic has sold hand torch cylinders. The facts alleged in the pleadings, however, when taken as true, establish that this is not the case. As admitted by Worthington in its Counterclaim [Doc. 35 at ¶1], Worthington became BernzOmatic's cylinder supplier in 2004, when it purchased Western Industries. As such, it was *Western Industries*, not Worthington, which supplied BernzOmatic's cylinder requirements prior to 2004. Furthermore, although Worthington became BernzOmatic's exclusive supplier when it purchased Western Suppliers in 2004, this exclusive arrangement ended after Worthington terminated the Supply Agreement in 2007 and BernzOmatic acquired other suppliers for its requirements. Thus, the Complaint's allegations, when taken as true, establish that at most Worthington was "the source" for BernzOmatic cylinders for three years at the most, not "all along" as represented in Worthington's advertisement. As such, the Court concludes that BernzOmatic has adequately stated a claim for false or misleading advertising under Section 43(a)(1)(B).

Worthington contends that BernzOmatic's claim for false advertising is also deficient because BernzOmatic has stated only the most "formulaic recitation" of injury arising from the alleged misrepresentations. [Doc. 11 at 17]. The Court concludes, however, that BernzOmatic has stated its claim of injury adequately, as the Complaint alleges that Worthington's false advertising damaged BernzOmatic's good will, diminished its sales, and unjustly increased Worthington's profits. [Doc. 1 at ¶70].

For these reasons, Worthington's Motion to Dismiss BernzOmatic's false advertising claim based upon the misleading representations made regarding the source of BernzOmatic's products is denied.

### b. False Designation of Origin

Section 43(a)(1)(A) of the Lanham Act prohibits a person from using

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).

Worthington contends the statements made in its advertisement are not actionable under Section 43(a)(1)(A) because it is undisputedly true that Worthington was a source of BernzOmatic's cylinders. [Doc. 11 at 18]. For the reasons set forth above, the Court concludes that BernzOmatic has pled sufficient facts to support a claim that Worthington's representations that it has been "the source" of BernzOmatic's hand torch cylinders "all along" are false and misleading and falsely imply an association between Worthington and BernzOmatic that is likely to confuse or deceive consumers. As such, the Court concludes that BernzOmatic has adequately stated a claim under Section 43(a)(1)(A) of the Lanham Act.

## 2. Tortious Interference with Prospective Business Relations Claim

Next, Worthington argues that BernzOmatic's claim for tortious interference with business relations under North Carolina law[3] is pled in conclusory fashion and should be dismissed. [Doc. 11 at 19].

At the outset, the Court notes that it is unclear what kind of cause of action BernzOmatic is actually alleging. Count VI is titled "Tortious Interference With Prospective Business Relations," but the allegations

---

[3]BernzOmatic has invoked North Carolina law as the basis for its state law claims. Worthington does not concede, however, that North Carolina law is applicable to this action. [Doc. 11 at 20 n.9].

contained therein relate to Worthington's alleged conduct directed to BernzOmatic's "relationships with its customers." [Doc. 1 at ¶79]. Tortious interference with contract and tortious interference with prospective business relations (also known as tortious interference with prospective advantage) are two distinct torts under North Carolina law. To prove a claim for tortious interference with contract, a plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

United Laboratories, Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). To prove a claim for tortious interference with prospective business relations, the plaintiff must show that the defendants "induced a third party to refrain from entering into a contract with [the plaintiff] without justification" and "that the contract would have ensued but for [the defendant's] interference." DaimlerChrysler Corp. v. H.C. Kirkhart, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002).

While generally alleging that Worthington interfered with BernzOmatic's "relationships with its customers," BernzOmatic has not identified any specific

contract that any of its customers were induced not to perform as a result of Worthington's actions.  See id. at 585, 561 S.E.2d at 285 (denying motion for preliminary injunction where plaintiff's complaint failed to identify any specific contract that a third party had been induced not to perform as a result of defendants' conduct).  Construing this claim as one for tortious interference with prospective business relations, BernzOmatic fares no better, as the Complaint fails to allege the existence of any particular customer which Worthington unjustifiably induced to refrain from entering into a contract with BernzOmatic, nor does it allege any specific contracts which would have ensued absent Worthington's interference.

BernzOmatic alleges that the Complaint's general references to BernzOmatic's relationships with its "Distribution Customers" is sufficient to identify the class of third parties with which BernzOmatic "had a reasonable expectation of continuing to do business."  [Doc. 27 at 23].  While the Supply Agreement does identify eleven specific "Distribution Customers," the term is defined broadly and non-exclusively to include "*All* Retail Mass Merchants, including but not limited to" the eleven so identified.  [Doc. 13 at 20, Ex. C] (emphasis added).  Given this non-exclusive definition, the Complaint's reference to BernzOmatic's relationships with "Distribution Customers" does

little to identify the contractual relationships with which BernzOmatic claims Worthington wrongfully interfered.

Given the fact, however, that this case will clearly be continuing on other better-pleaded grounds, the Court will give BernzOmatic more than the benefit of the doubt and construe these allegations very broadly to at least include the eleven Distribution Customers and BernzOmatic's contractual relationships therewith.

For this reason, even though it is a very close case, the Court will deny Worthington's Motion to Dismiss [Doc. 10] BernzOmatic's state law claim for tortious interference under North Carolina law.

### 3.   Robinson-Patman Act Claim

The Robinson-Patman Act provides, in pertinent part, as follows:

> It shall be unlawful for any person engaged in commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition . . . .

15 U.S.C. §13(a).  In enacting this provision, Congress intended to "to target the perceived harm to competition occasioned by powerful buyers, rather than

sellers; specifically, Congress responded to the advent of large chain stores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand." <u>Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.</u>, 546 U.S. 164, 175, 126 S.Ct. 860, 869, 163 L.Ed.2d 663 (2006) (internal citations omitted).

In order to state a claim under the Robinson-Patman Act, a plaintiff must show: (1) that the relevant sales were made in interstate commerce; (2) that the goods sold were of "like grade and quality"; (3) that the seller discriminated in price between the plaintiff and another purchaser; and (4) that "'the effect of such discrimination [was] to injure, destroy, or prevent competition' to the advantage of a favored purchaser, <u>i.e.</u>, one who 'receive[d] the benefit of such discrimination.'" <u>Id.</u> (quoting 15 U.S.C. § 13(a)). Worthington contends that BernzOmatic's Complaint fails to allege sufficiently the second, third, and fourth elements of this claim.

### a. Like Grade and Quality

Worthington first argues that the Complaint is conclusory and fails to allege specific facts plausibly showing that hand torch cylinders of "like grade and quality" were sold to BernzOmatic and its competitors. [Doc. 11 at 8].

The Complaint alleges that shortly following the termination of the Supply Agreement in March 2007, Worthington began manufacturing and selling its own hand torch cylinders in direct competition with BernzOmatic. [Doc. 1 at ¶¶19, 28]. The Complaint specifically alleges that the hand torch cylinders manufactured by Worthington following the termination of the Supply Agreement "were physically similar to the hand torch cylinders by BernzOmatic" and that, "[o]n information and belief," these cylinders were "substantially the same product [Worthington] sold to BernzOmatic." [Id. at ¶28]. The Complaint additionally alleges that Worthington sold these hand torch cylinders to favored purchasers who were BernzOmatic's competitors. [Id. at ¶¶29, 84].

Worthington contends that these allegations are insufficient to show that the goods were of "like grade and quality" because only a broad range of cylinders is identified. In support of this argument, Worthington relies upon Tires, Inc. of Broward v. Goodyear Tire & Rubber Co., 295 F.Supp.2d 1349 (S.D. Fla. 2003), in which the district court granted a motion to dismiss due to the plaintiff's failure to allege with any specificity that the goods at issue were of "like grade and quality." The Tires decision, however, is distinguishable from the present case. In Tires, the plaintiff tire distributor

failed to allege the make and model of specific tires sold by Goodyear to a particular defendant and failed to state with any specificity facts to support the conclusion that the tires sold by the plaintiff were of like grade and quality.  Id. at 1352.  By contrast, BernzOmatic has provided an adequate description of the products which it contends were of "like grade and quality."  Specifically, BernzOmatic alleges that the hand torch cylinders manufactured and sold by Worthington to BernzOmatic and its competitors "have a volume of between 40 and 70 cubic inches (in most instances, approximately 62 cubic inches), are capable of holding pressurized flammable gases, including propane, oxygen, MAPP gas, and propylene gas, and generally have a threaded valve on top that permits the attachment of a torch."  [Id. at ¶83].  The Supply Agreement indicates that Worthington manufactured seven different cylinder types within this volumetric range.  [Doc. 13 at 15, Ex. A].  Accordingly, the Court concludes that the Complaint adequately alleges facts sufficient to state a plausible claim that the goods sold by Worthington to BernzOmatic and its competitors were of "like grade and quality."

### b.    Sale to a Competitor

Worthington next argues that the Complaint fails to allege facts plausibly showing that Worthington made sales to an actual competitor of BernzOmatic

and thus BernzOmatic cannot establish a competitive injury. Specifically, Worthington contends that to the extent that the allegations are founded on "information and belief," they are inadequate and merely conjectural. [Doc. 11 at 10-11]. The Court finds these arguments to be unpersuasive.

The Complaint alleges that Worthington manufactured hand torch cylinders that were substantially the same product that they had sold to BernzOmatic under the Supply Agreement. [Doc. 1 at ¶28]. The Complaint further alleges that "Worthington sold such hand torch cylinders to favored purchasers who were competitors of BernzOmatic, including, on information and belief, one or more of the Thermadyne companies (Thermadyne Holdings Corporation and its subsidiaries and affiliates, which sell torch and torch-related products under brands including Victor® and TurboTorch®), at lower prices than [Worthington] charged BernzOmatic." [Doc. 1 at ¶29]. These allegations specifically identify BernzOmatic's alleged competitors (Thermadyne Holdings Corporation and its various subsidiaries and affiliates); the goods that were sold to them (hand torch cylinders manufactured by Worthington); and the market in which these companies compete (the sale of torches and torch-related products). These allegations provide significantly more details than the mere conclusory allegations that were deemed to be

insufficient in the cases cited by Worthington. See, e.g., Atlantic Recording Corp. v. Brennan, 534 F.Supp.2d 278, 283 (D. Conn. 2008) ("Rather than provide 'factual allegations' sufficient to make their claims for relief more than mere conjecture, Plaintiffs' allegations of infringement lack any factual grounding whatsoever, and rely instead on their 'information and belief' that [Defendant] willfully violated their exclusive rights."); 316, Inc. v. Maryland Cas. Co., No. 3:07cv528-RS-MD, 2008 WL 2157084, at *4 (N.D. Fla. May 21, 2008) (finding plaintiff's allegations made on information and belief "set[] forth no further information to 'factually suggest' that its characterization of Defendant's alleged wrongful conduct ... is 'plausible,' as Twombly requires"). In light of the specific factual details provided in the Complaint, the fact that some of the allegations are based upon "information and belief" does not render the Plaintiff's allegations insufficient.

For these reasons, the Court concludes that the Complaint adequately alleges facts plausibly showing that Worthington made sales to a competitor of BernzOmatic.

### c.    Price Discrimination and Injury

Next, Worthington argues that the Complaint does not adequately allege facts to show that Worthington discriminated in price between BernzOmatic

and its competitors, or that this discriminatory pricing resulted in an injury either to competition or to BernzOmatic itself. [Doc. 11 at 11-14].

To establish an injury under the Robinson-Patman Act, BernzOmatic must show that Worthington discriminated in price between BernzOmatic and another purchaser and that the effect such discrimination was "to injure, destroy, or prevent competition" to the advantage of the favored purchaser. Volvo Trucks, 546 U.S. at 177, 126 S.Ct. 860. The Supreme Court has recognized "that a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time." Id.

BernzOmatic alleges in its Complaint that after terminating the Supply Agreement, Worthington sold hand torch cylinders to BernzOmatic at "dramatically increased prices"; that during this time and continuing to the time of the filing of the complaint, Worthington sold hand torches of like grade and quality to one or more of the Thermadyne companies at lower prices than they charged BernzOmatic; and that in so doing, "Worthington injured competition and deprived BernzOmatic of sales and profits to which it was lawfully entitled." [Doc. 1 at ¶¶22, 29, 84-87]. While these allegations are admittedly sparse, they sufficiently allege facts which would plausibly show

that BernzOmatic has suffered a cognizable injury under the Robinson-Patman Act. BernzOmatic has alleged that an identified competitor received more favorable pricing from March 2007 to the present; that BernzOmatic was damaged in the form of lost sales and profits as a result of this price discrimination; and that the price discrimination resulted in harm to competition. Cf. Monsieur Touton Selection, Ltd. v. Future Brands, LLC, No. 06 Civ. 1124(SAS), 2006 WL 2192790, at *6 (S.D.N.Y. Aug. 1, 2006) (granting motion to dismiss where complaint failed to "allege the existence of a single favored purchaser, and [gave] virtually no indication of the time period in which the alleged discrimination took place"). For these reasons, the Court concludes that the Complaint adequately alleges facts to show a cognizable injury under the Robinson-Patman Act.

Accordingly, the Defendants' Motion to Dismiss BernzOmatic's claim for violation of the Robinson-Patman Act is denied.

### 4. UDTPA Claim

BernzOmatic alleges that Worthington violated the UDTPA in the following ways: (1) by using the BernzOmatic trade name, trademark and logo to mislead and consumers with false advertising [Doc. 1 at ¶72]; (2) by interfering with BernzOmatic's customer relationships in an attempt to take

business away from BernzOmatic [id. at ¶73]; and (3) by improperly and unjustifiably raising the prices it charges to BernzOmatic, thereby injuring BernzOmatic and its ability to compete in the market [id. at ¶74].

Worthington argues that BernzOmatic's UDTPA claim rests on allegations identical to those forming the basis for its Robinson-Patman Act, Lanham Act, and tortious interference claims and therefore, the UDTPA claim should be dismissed for the same reasons asserted by Worthington with respect to those claims. Alternatively, Worthington argues that the facts alleged fail to state egregious or aggravating circumstances to support an action for unfair and deceptive trade practices under the statute. [Doc. 11 at 22].

Under the UDTPA, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a). The Act "prohibits unfair and deceptive acts which undermine ethical standards and good faith dealings between parties engaged in business transactions." First Atl. Mgmt. Corp. v. Dunlea Realty Co., 131 N.C. App. 242, 252, 507 S.E.2d 56, 63 (1998).

In order to prevail on a claim for unfair and deceptive trade practices under the UDTPA, a plaintiff must show the following: (1) that the defendant committed an unfair or deceptive act or practice; (2) that the act or practice was in or affecting commerce; and (3) that the plaintiff was injured thereby. Id. A "deceptive trade practice" is one that "has the capacity or tendency to deceive," and an "unfair trade practice" is a practice that is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Phelps-Dickson Builders, LLC v. Amerimann Partners, 172 N.C. App. 427, 439, 617 S.E.2d 664, 671 (2005). The North Carolina Supreme Court has recognized that an unfair act or practice is committed where the party "engages in conduct manifesting an inequitable assertion of power or position." Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

Generally speaking, an allegation of a breach of contract, even if intentional, will not support a claim of an unfair or deceptive trade practice. Horack v. Southern Real Estate Co. of Charlotte, Inc., 150 N.C. App. 305, 310, 563 S.E.2d 47, 51 (2002). Thus, where a breach of contract is involved, "a plaintiff must show substantial aggravating circumstances attending the

breach to recover under the Act ...." Id. (quoting Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989)).

Reviewing the allegations pertaining to the UDTPA claim, the Court concludes that BernzOmatic has alleged sufficient facts to support a claim for unfair or deceptive trade practices. Specifically, BernzOmatic has alleged that Worthington used BernzOmatic's trade name, trademark and logo to mislead consumers with false advertising; that Worthington engaged in unfair competition by interfering with BernzOmatic's customer relationships; and that Worthington improperly and unjustifiably raised the prices it charged to BernzOmatic, thereby injuring BernzOmatic and competition within the market. [Doc. 1 at ¶¶72-74]. Because BernzOmatic has adequately pleaded facts to support a claim for unfair and deceptive trade practices based upon false advertising, tortious interference with customer relationships, and price discrimination, Worthington's Motion to Dismiss BernzOmatic's UDTPA claim is denied.

## III. PLAINTIFFS' MOTIONS TO DISMISS DEFENDANTS' COUNTERCLAIMS

BernzOmatic moves to dismiss Worthington's Amended Counterclaims for fraudulent inducement and breach of contract pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to state a claim and

pursuant to Rule 9(b) of the Federal Rules of Civil Procedure for failing to plead fraud with the requisite particularity.  [Doc. 42].

### A.    Applicable Standard of Review

The same standard of review applicable to a Rule 12(b)(6) motion attacking the legal sufficiency of a complaint applies to a Rule 12(b)(6) motion challenging a defendant's counterclaim.  Thus, in reviewing a motion to dismiss a counterclaim, the Court must view the defendant's well-pleaded factual allegations as true.  <u>See</u> <u>Eastern Shore Markets</u>, 213 F.3d at 180. The defendant's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the [counterclaim] are true (even if doubtful in fact)."  <u>Twombly</u>, 127 S.Ct. at 1965 (citations and footnote omitted).

Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Fourth Circuit has held that "in a case governed by Rule 9(b), the plaintiff must allege the speaker, time, place, and contents of the allegedly false statement."  <u>Baltimore County v. Cigna Healthcare</u>, 238 Fed. Appx. 914, 924 (4th Cir. June 5, 2007) (citing <u>United States ex rel. Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 784 (4th Cir.1999)).  "A

court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

## B.    Factual Background

At the time that the parties were negotiating the Supply Agreement in 2005, Worthington was interested in remaining the exclusive supplier of hand torch cylinders for all of BernzOmatic's requirements worldwide. BernzOmatic assured Worthington during the course of these negotiations that Worthington would be BernzOmatic's exclusive supplier of *all* of BernzOmatic's hand torch cylinder requirements worldwide, and Worthington relied upon these representations. [Doc. 35 at ¶4].

On February 8, 2005, George Stoe ("Stoe"), who was then president of Worthington Cylinders, met with Ken Goodgame ("Goodgame"), who was then president of BernzOmatic. During this meeting, Stoe expressed concern that BernzOmatic might seek to compete with Worthington in the sale of hand held torch cylinders, either by manufacturing its own competing product or by acquiring UltraBlue, a Canadian company that manufactured and sold a hand

held torch cylinder that is competitive with the hand held torch cylinder manufactured by Worthington.  Stoe stated to Goodgame that if BernzOmatic intended to compete with Worthington, Worthington needed to know in order to begin its own plans to compete with BernzOmatic and because such plans would affect negotiations of the Supply Agreement.  Stoe also communicated Worthington's insistence that BernzOmatic sell only Worthington's hand held torch cylinders worldwide.  [Id. at ¶5].  In response to these concerns, Goodgame stated "that BernzOmatic would not compete in any way with Worthington in the sale of hand held torch cylinders and would not acquire UltraBlue."  [Id. at ¶6].  Goodgame further stated that "BernzOmatic had considered acquiring UltraBlue before Worthington acquired Western but had decided not to do so."  [Id. at ¶¶6, 15].

During the negotiation of the Supply Agreement, BernzOmatic represented to Worthington that the lower size parameter of "Covered Cylinders" should be 40 cubic inches so as to exclude from the Supply Agreement certain cylinders that did not compete with Worthington's hand held torch cylinders, including certain $CO_2$ cartridges that BernzOmatic distributed for nail gun use.  [Id. at ¶9].  Additionally, Goodgame stated in an email to Stoe on June 2, 2005 that the lower size parameter was selected so

that BernzOmatic could protect its butane and micro torch fuel sourcing from Korea. [Id.]. Worthington alleges that these representations were false, and that it justifiably relied on these representations in executing the Supply Agreement. [Id.].

During the negotiations of the Supply Agreement, BernzOmatic intentionally omitted the disclosure of its "strategic business plans to expand its market penetration in the hand held torch and replacement cylinder market by selling hand held torches utilizing cylinders other than Worthington's hand torch cylinders." [Id. at ¶10]. Specifically, BernzOmatic failed to disclose to Worthington that it was planning to increase its market penetration by acquiring UltraBlue and by expanding sales of UltraBlue PowerCell torches at the expense of Worthington's cylinders. [Id. at ¶¶11, 12]. Worthington alleges that BernzOmatic's failure to disclose such plans was a material omission and that BernzOmatic had a duty to disclose such plans to Worthington. [Id. at ¶10]. Worthington further asserts that the real reason BernzOmatic insisted that the lower size parameter of "Covered Cylinders" be set at 40 cubic inches was to exclude PowerCell cylinders, which have an internal volume of 37.88 cubic inches, from the scope of the Supply Agreement. [Id. at ¶14].

On January 13, 2006, just thirteen days after the effective date of the new Supply Agreement with Worthington, BernzOmatic acquired UltraBlue. [Id. at ¶19]. BernzOmatic entered the market with PowerCell cylinders in mid-2006 and since then has sold "substantial numbers" of PowerCell cylinders to retail mass merchants. [Id. at ¶23]. BernzOmatic promotes the compact size of PowerCell as a competitive advantage to a hand held torch with Worthington's cylinder. [Id. at ¶24]. Specifically, BernzOmatic markets PowerCell by claiming a 60% reduction in cylinder weight and a 50% reduction in cylinder height, compared to the Worthington hand torch cylinders, while emphasizing that PowerCell has all the power of a Worthington hand torch cylinder. [Id. at ¶23]. Since mid-2006, PowerCell torches have occupied the same shelf space at retail mass merchants as the BernzOmatic hand held torches utilizing the Worthington hand torch cylinders. [Id. at ¶25]. PowerCell torches are purchased by the same users, for the same applications, as the BernzOmatic hand held torches with the Worthington hand torch cylinders. [Id.]. Thus, every sale of a PowerCell torch or a replacement cylinder for such torch has resulted in the loss of a sale of a BernzOmatic torch with a Worthington hand torch cylinder, or a Worthington replacement hand torch cylinder. [Id. at ¶26].

In its Amended Counterclaim, Worthington alleges that BernzOmatic fraudulently induced it to enter into the Supply Agreement by making material misrepresentations and omissions. [Id. at ¶¶31-37]. Worthington also alleges that BernzOmatic breached the Supply Agreement by failing to use its best efforts to promote the sale of hand held torches with Worthington hand torch cylinders, and by failing to exercise good faith in the execution and performance of the Supply Agreement. [Id. at ¶¶38-40].

## C. Analysis

### 1. Fraudulent Inducement Claim

Despite the inclusion of additional factual allegations in the Amended Counterclaim, BernzOmatic contends that Worthington's claim for fraudulent inducement still fails to comply with Rule 9(b). Additionally, BernzOmatic argues that the fraudulent inducement claim should be dismissed because any claim of justifiable reliance is barred as a matter of law, and because Worthington failed to allege facts sufficient to support a claim for fraudulent omission. [Doc. 43].

#### a. Particularity

While conceding that that the allegations added through the Amended Counterclaim provide sufficient particularity as to some of the allegations of

fraudulent statements, BernzOmatic argues that the remainder of Worthington's fraud allegations are still impermissibly vague under Rule 9(b). [Docs. 43, 48]. Viewing the allegations in the Amended Counterclaims as a whole, however, the Court is satisfied that Worthington has alleged sufficient facts to satisfy the requirements of Rule 9(b) and to give BernzOmatic notice of the factual circumstances surrounding Worthington's fraudulent inducement claim. Accordingly, BernzOmatic's Motion to Dismiss Worthington's breach of contract claim pursuant to Fed. R. Civ. P. 9(b) is denied.

### b. Justifiable Reliance

BernzOmatic argues that Worthington's claim of justifiable reliance on the alleged misrepresentations is barred by the parol evidence rule as well as the integration clause[4] of the Supply Agreement. [Doc. 43 at 7-16].

----

[4]Section 8.2 of the Supply Agreement [Doc. 13 at 12, §8.2] provides as follows:

> Entire Agreement. Effective on the Effective Date, this Agreement embodies the entire understanding, superseding all prior oral or written agreements . . ., understandings, negotiations and correspondence between the parties concerning the continuing relationship between the parties and the purchase/sale of Covered Cylinders during the term of this Agreement. There are no conditions to this Agreement which are not set forth herein; and no additional or different terms set forth in either party's purchase order, quotation, order acknowledgement, invoice or other forms or correspondence shall be of any force or effect with respect to the purchase/sale of Covered Cylinders during the term of this Agreement.

By its terms, the Supply Agreement is governed by Ohio law. [Doc. 13 at 12, §8.4]. Because the Supply Agreement involved the sale of goods for more than $500 and was between merchants who deal in goods of the kind involved in the transaction, the provisions of Article 2 of the Ohio version of the Uniform Commercial Code (UCC), as supplemented by principles of Ohio common law, apply to the parties' contract. <u>See</u> Ohio Rev. Code Ann. § 1302.02; <u>J.A. Indus., Inc. v. All Am. Plastics, Inc.</u>, 133 Ohio App.3d 76, 83, 726 N.E.2d 1066, 1070 (1999).

Under Ohio law, a party asserting a claim for fraudulent inducement must establish the following elements:

> (1) a representation or, when there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance on the representation or concealment, and (6) an injury proximately caused by that reliance.

<u>Gentile v. Ristas</u>, 160 Ohio App.3d 765, 781, 828 N.E.2d 1021, 1033 (2005).

Generally speaking, "when two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or

otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."  Glazer v. Lehman Bros., Inc., 394 F.3d 444, 455 (6th Cir. 2005) (quoting 3A Corbin, Contracts § 573 at 357 (1960)).  As construed by the Ohio courts, the parol evidence rule provides that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements."  Glazer, 394 F.3d at 455 (quoting Galmish v. Cicchini, 90 Ohio St.3d 22, 27, 734 N.E.2d 782, 788 (2000)).  The parol evidence rule does not, however, "prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement."  Galmish, 90 Ohio St.3d at 28, 734 N.E.2d at 789.  As the Ohio Supreme Court explained, "it was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud, or that a person could arrange to have an agreement which was obtained by him through fraud exercised upon the other contracting party reduced to writing and formally executed, and thereby deprive the courts of the power to prevent him from reaping the benefits of his deception or chicanery."  Id. (quoting 37 Am. Jur. 2d Fraud and Deceit § 451 at 621-22 (1968)).

The inclusion of an integration clause in the contract does not change this rule. "The presence of an integration clause makes the final written agreement no more integrated than does the act of embodying the complete terms into the writing. Thus, the presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud." Galmish, 90 Ohio St.3d at 28, 734 N.E.2d at 790.

> However, the parol evidence rule may not be avoided by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing. Accordingly, an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms. In other words, the Parol Evidence Rule will not exclude evidence of fraud which induced the written contract. But, a fraudulent inducement case is not made out simply by alleging that a statement or agreement made prior to the contract is different from that which now appears in the written contract. Quite to the contrary, attempts to prove such contradictory assertions is exactly what the Parol Evidence Rule was designed to prohibit.

Id. at 29, 734 N.E.2d at 790.

Upon reviewing the allegations of the Amended Counterclaim, the Court determines that Worthington has set forth sufficient factual allegations to support a claim that BernzOmatic made fraudulent statements upon which Worthington justifiably relied when entering into the Supply Agreement.

Under Ohio law, neither the parol evidence rule nor the integration clause in the parties' agreement prohibits Worthington from introducing parol or extrinsic evidence to prove this fraudulent inducement.  BernzOmatic's argument to the contrary is without merit.

### c.    Fraudulent Omission

BernzOmatic contends that Worthington cannot state a claim based upon an alleged fraudulent omission regarding BernzOmatic's "strategic business plans" because BernzOmatic had no duty to disclose such plans to Worthington.  [Doc. 43 at 16-18].  Whether BernzOmatic had any such duty, however, is of no moment: Worthington has alleged that BernzOmatic affirmatively misrepresented its strategic business plans in order to induce Worthington to agree to the Supply Agreement.  As such, Worthington has stated adequately a claim for fraudulent inducement, and BernzOmatic's Motion to Dismiss  [Docs. 25, 42] this counterclaim, as amended, must be denied.

### 2.    Breach of Contract Claim

BernzOmatic moves to dismiss Worthington's breach of contract counterclaim, which is premised on the breach of two implied contractual terms: (1) the purported duty to use "best efforts" to promote the sale of

Worthington-manufactured hand torch cylinders and (2) the duty of good faith and fair dealing that is implied in every contract. [Doc. 26 at 12-15; Doc. 41 at 4-10].

Section 2.1 of the Supply Agreement requires BernzOmatic to purchase from Worthington, and for Worthington to sell to BernzOmatic, "100% of BernzOmatic's Requirements for Covered Cylinders worldwide." [Doc. 13 at 2, §2.1]. Section 2.2 of the Supply Agreement provides that BernzOmatic has the exclusive right to sell the Covered Cylinders to certain "Distribution Customers," and that Worthington has the exclusive right to sell Covered Cylinders to certain "Direct Account Customers":

> Exclusivity. [Worthington] agrees, on behalf of itself and its Affiliates, that during the term of this Agreement, *BernzOmatic shall be the sole outlet for Covered Cylinders to be supplied by [Worthington] or its Affiliates to BernzOmatic Distribution Customers*. BernzOmatic agrees on behalf of itself and its Affiliates that during the term of this Agreement *no BernzOmatic Company shall offer, sell or supply Covered Cylinders to any [Worthington] Direct Account Customer*. Notwithstanding the foregoing, BernzOmatic shall be entitled to offer, sell or supply Covered Cylinders to any [Worthington] Direct Account Customer as part of a kit or ensemble which includes at least one torch and one Covered Cylinder.

[Doc. 13 at 3, §2.2] (emphasis added).  The Supply Agreement defines "BernzOmatic Distribution Customers" as "Retail Mass Merchants," which are in turn defined as:

> (a) Mass merchants, including discount stores, department stores, grocery stores, convenient stores, drug stores, sporting goods stores and hardware stores; and (b) Heating, ventilation and air conditioning (HVAC) or plumbing distributors.

[Id. at 2, §1.7].  Examples of eleven businesses, such as Home Depot and Wal-Mart, which constitute "Retail Mass Merchants" within the meaning of the contract are attached as an exhibit to the Supply Agreement.  [Doc. 13 at 20, Ex. C].  The Supply Agreement states that the term "Retail Mass Merchants" does not include "(i) Customers that manufacturer [sic] or source torches or other products that use Covered Cylinders as a fuel source for sale to mass merchants . . ., (ii) gas producers or industrial gas and welding distributors ... that may sell Covered Cylinders through their own retail business, or (iii) customer that buy empty Covered Cylinders."  [Id. at 2, §1.7].

The Supply Agreement defines Worthington's "Direct Account Customers" as "parties, other than BernzOmatic and BernzOmatic Distribution Customers, that purchase Covered Cylinders."  [Id. at 2, §1.9].  Worthington's "Direct Account Customers" include 73 entities that are listed in an attachment

to the Supply Agreement, [id. at 18, Ex. B], and the Supply Agreement provides that Worthington may request in writing that other parties who qualify be added to this list [id. at 2, §1.9].

Under Ohio law, "a contractual provision which gives a party the exclusive right to market a product on behalf of another imposes upon that party a duty to employ reasonable efforts to generate sales of the product." Illinois Controls, Inc. v. Langham, 70 Ohio St.3d 512, 520, 639 N.E.2d 771, 779 (1994). "This obligation is intended to protect the original seller, who in an exclusive arrangement depends *solely* upon the buyer to resell the goods." Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1125 (3d Cir. 1992) (emphasis added). The Ohio UCC codifies this duty:

> A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

Ohio Rev. Code Ann. § 1302.19(B). As explained in the Official Comments to this provision, in an exclusive dealing arrangement, "the exclusive agent is required, although no express commitment has been made, to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be." Id., Official Comment 5.

The parties disagree as to whether the Supply Agreement is an exclusive dealing arrangement giving rise to a duty on the part of BernzOmatic to use its best efforts in marketing Worthington's products. BernzOmatic contends that the Supply Agreement is not an exclusive dealing arrangement because the Agreement explicitly permits Worthington to sell Covered Cylinders to customers other than BernzOmatic. [Doc. 41 at 6]. Worthington contends, on the other hand, that the Supply Agreement is an exclusive dealing arrangement because it prohibits Worthington from selling Covered Cylinders to a particular market – i.e., retail mass merchants, a market which Worthington contends accounted for 80% of all sales of Worthington-manufactured torch cylinders. [Doc. 44-2 at 2-3].

The District Court for the Southern District of New York was presented with a similar issue in MDC Corp. v. John H. Harland Co., 228 F.Supp.2d 387 (S.D.N.Y. 2002). In that case, both parties were sellers of checks and other financial forms; the Defendant Harlan sold checks to banks and financial institutions, while the Plaintiff Artistic sold checks directly to consumers. Id. at 389. The parties entered into a series of written agreements whereby Artistic agreed to purchase its requirements of checks from Harlan, and Harland agreed to supply Artistic's check requirements for its direct sale to

consumers. Id. The parties' agreements specifically prohibited Harland from competing with Artistic in the direct mail market, but allowed Harland to maintain supply relationships with catalog companies and certain other direct mail companies. Id. at 389-90. When Artistic began buying checks from other sources, Harland alleged that Artistic breached the duty to use its best efforts in promoting Harland's products. Id. at 392. Artistic moved to dismiss Harland's claim, arguing that it had no implied obligation to use best efforts to promote Harland's products because Harland was permitted to maintain other discrete supply relationships. Id. at 392-93. The district court rejected Artistic's argument, reasoning that an exclusive dealing arrangement is not determined by whether the seller has any other potential outlets other than the single designated buyer, but rather whether one commercial party has the other "'at [its] mercy' *in a particular market*." Id. at 394 (emphasis added). The district court denied Artistic's motion to dismiss, concluding that it could not decide based solely on the parties' contracts and the pleadings that the contracts did not constitute an exclusive dealing arrangement. Id. at 394-95.

The Court finds the reasoning of MDC persuasive in the present case. As such, the relevant inquiry is not whether Worthington had other potential outlets (i.e., Direct Account Customers) for its goods, as suggested by

BernzOmatic, but rather BernzOmatic had Worthington "at its mercy" in a *particular market*. What constitutes the relevant market cannot be determined as a matter of law at this stage in the proceedings. Accordingly, the Court cannot determine that the relationship between the parties was not an exclusive dealing arrangement. Therefore, BernzOmatic's Motion to Dismiss Worthington's breach of contract counterclaim claim based on the breach of the implied duty to use best efforts [Docs. 25, 42] is denied.

In sum, the Court concludes that the parties have pled sufficient allegations so as to survive motions to dismiss pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure. In so holding, the Court does not intend to express any opinion regarding the merits of the parties' substantive claims going forward. Specifically, the Court expresses no opinion as to whether any such claims would be subject to dismissal pursuant to a properly supported summary judgment motion.

## **O R D E R**

Accordingly, **IT IS, THEREFORE, ORDERED** that:

(1)    Defendants' Motion to Dismiss [Doc. 10] is **DENIED**;

(2)     Plaintiffs' Motion to Dismiss Defendants' Counterclaims
        [Doc. 25] is **DENIED**; and

(3)     Plaintiffs' Motion to Dismiss Defendants' Amended
        Counterclaims [Doc. 42] is **DENIED**.

**IT IS SO ORDERED**.

Signed: March 6, 2009

Martin Reidinger
United States District Judge