**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL CASE NO. 3:08cv291**

| | |
|---|---|
| **IRWIN INDUSTRIAL TOOL COMPANY, d/b/a BernzOmatic and NEWELL OPERATING COMPANY,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| ) **vs.** ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| ) **WORTHINGTON CYLINDERS WISCONSIN, LLC, WORTHINGTON CYLINDER CORPORATION, and WORTHINGTON INDUSTRIES, INC.,** ) ) ) ) ) | |
| **Defendants.** ) ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for

Summary Judgment [Doc. 148] and the Plaintiffs' Motion for Summary

Judgment [Doc. 150].

## I.    PROCEDURAL BACKGROUND

This action arises out a contract for the supply of fuel cylinders

executed between the Plaintiffs Irwin Industrial Tool Company d/b/a

BernzOmatic and Newell Operating Company (collectively "BernzOmatic"

or "BZO") and the Defendants Worthington Cylinders Wisconsin, LLC, Worthington Cylinder Corporation, and Worthington Industries, Inc. (collectively "Worthington" or "WCW"). In Counts I, II, III, and IV of its Complaint, BZO alleges various claims arising from WCW's purported breach of the parties' contract. In the remaining counts of the Complaint, BZO asserts claims for false advertising, in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count V); unfair and deceptive trade practices, in violation of N.C. Gen. Stat. §§ 75-1.1, et seq. (Count VI) ("UDTPA claim"); tortious interference with prospective business relations in violation of North Carolina law (Count VII); and unlawful price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13 (Count VIII). [Complaint, Doc. 1]. WCW, in turn, asserts counterclaims for fraudulent inducement and breach of contract. [Amended Counterclaim, Doc. 35].

On March 9, 2009, the Court denied both WCW's Motion to Dismiss Counts V through VIII of BZO's Complaint and BZO's Motion to Dismiss Defendants' Counterclaims. [Doc. 72]. After conducting several months of discovery, the parties filed their respective Motions for Summary Judgment on October 1, 2009. [Docs. 148, 150]. Response briefs were filed on

October 19, 2009 [Docs. 158, 159], and Reply briefs were filed on October 26 and 29, 2009, respectively [Docs. 161, 163].

The Court held a hearing on the parties' Motions on December 16, 2009. Following an extensive oral argument, the Court orally pronounced that summary judgment would be granted as to the following claims: (1) BZO's claim for tortious interference with contract; (2) BZO's UDTPA claim, to the extent that such claim rests upon allegations of tortious interference with contract; and (3) WCW's claim for fraudulent inducement. In all other respects, the parties' Motions were denied, and such ruling was reflected in the Court's minute entry. Subsequent to this hearing, BernzOmatic voluntarily dismissed its Robinson-Patman Act claim. [Doc. 170].

Summary judgment having been denied as to Worthington's breach of contract claim and BernzOmatic's claims asserting trade dress infringement and false advertising, as well as unfair and deceptive trade practices related to such conduct, such claims need not be addressed further in this opinion. The Court will limit its discussion in this opinion to those claims for which summary judgment has been granted.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522.  If this

showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id.  (internal citations and quotation marks omitted).  Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party.  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III.    FACTUAL BACKGROUND

Before addressing the specific claims asserted by the parties, the Court will briefly summarize the history of the parties' contractual relationship.

BZO is in the business of manufacturing hand torches.  [See BZO 30(b)(6) Dep., WCW Ex. 1B, at 21].  Hand torches rely on attached cylinders for fuel.  [Goodgame Dep., WCW Ex. 1D at 41].  Until 2003, a 14.1-ounce pressurized gas cylinder manufactured by Western Industries ("Western") was the only fuel cylinder used for hand torches in North America.  [BZO 30(b)(6) Dep., WCW Ex. 1B at 161-62; Starrett Dep., WCW Ex. 1I at 39].

In 2001, Western and BZO entered into a contract ("2001 Agreement") pursuant to which the parties agreed that Western would supply BZO with its requirements for "Covered Cylinders" and that BZO would be "the sole outlet for Covered Cylinders to be sold by Western or its subsidiaries worldwide."  [2001 Agreement, WCW Ex. 11G at §§2.1, 2.2].  A "Covered Cylinder" was defined in the 2001 Agreement as:

> a filled or unfilled cylinder having an internal volume of 62 cubic inches or less and meeting the standard established in U.S. Department of Transportation Regulation 39.

[Id. at § 1.1].

After purchasing Western in September 2004, WCW succeeded Western as the supplier under the 2001 Agreement. [See WCW Form 10-Q, WCW Ex. 11H]. On or about June 24, 2005, WCW and BZO entered into a new three-year Supply Agreement ("Supply Agreement") to become effective January 1, 2006. [See Stipancich Dep., WCW Ex. 1J at 99]. Pursuant to the new Supply Agreement, the parties agreed that BZO would continue to purchase its requirements of Covered Cylinders from WCW for a period of three years. [Supply Agreement, WCW Ex. 11E at §2.1].

The Supply Agreement refined the definition of "Covered Cylinder" as follows:

> "Covered Cylinder" shall mean a filled or unfilled cylinder of the type currently being purchased by BernzOmatic from WCW having an internal volume of approximately 62 cubic inches, and meeting the standard established in U.S. Department of Transportation Regulation 39 or a comparable standard used outside the United States *and, to the extent provided in Section 6.1, any other cylinders having an internal volume of greater than 40 but less than 70 cubic inches which may in the future be used by BernzOmatic for the same or a similar purpose*.

[Id. at §1.2] (emphasis added).

The Supply Agreement further provided, in pertinent part, as follows:

> Exclusivity.  WCW agrees, on behalf of itself and its Affiliates, that during the term of this Agreement, *BernzOmatic shall be the sole outlet for Covered Cylinders* to be supplied by WCW or its Affiliates worldwide *to BernzOmatic Distribution Customers* ....

[Id. at §2.2] (emphasis added).  The Supply Agreement defined "BernzOmatic Distribution Customers" as "Retail Mass Merchants" who purchase cylinders covered by the parties' Agreement.  [Id. at §1.4]. "Retail Mass Merchants" were defined in the Supply Agreement as (1) mass merchants, including discount stores, department stores, and hardware stores, and (2) heating, ventilation, and air conditioning (HVAC) or plumbing distributors.  [Id. at §1.7].  The Supply Agreement further provided WCW the exclusive right to sell Covered Cylinders to "WCW Direct Account Customers," which were defined as "parties, other than BernzOmatic and BernzOmatic Distribution Customers, that purchase Covered Cylinders." [Id. at §§1.9, 2.2].  The gist of this provision was that WCW could sell to BZO's competitors, but not to BZO's customers.

The Supply Agreement provided WCW with the right to terminate the exclusivity provisions of the Agreement as they relate to BZO Distribution Customers should BZO purchase fewer than 14,250,000 Covered

Cylinders per year.  [Id. at §7.1].  The Supply Agreement further provided that in the event that WCW terminated these exclusivity provisions, such termination would relieve BZO of its exclusivity commitments to WCW. [Id.].

On January 2, 2007, WCW gave notice to BZO of its intent to terminate the exclusivity provisions of the Supply Agreement due to BZO's failure to purchase more than 14,250,000 Covered Cylinders in 2006. [Goussetis Letter Jan. 2, 2007, BZO Ex. 189].  On January 29, 2007, WCW gave notice of its termination of the entire Supply Agreement effective March 1, 2007, claiming that BZO's acquisition of a company named Ultra Blue Technologies Inc. ("Ultra Blue") one year earlier and its sale of Ultra Blue's PowerCell products were not acts of good faith under the Supply Agreement, and that it considered BZO's sales of PowerCell products to be directly competitive with its sales of WCW's cylinders. [Goussetis Letter Jan. 29, 2007, BZO Ex. 10].

## III.    BZO's TORTIOUS INTERFERENCE CLAIM

In support of its claim for tortious interference with prospective business relations, BZO alleges that following the termination of the Supply

Agreement, WCW engaged in efforts to diminish BZO's reputation with its customers and to impose drastic price increases upon BZO, thereby adversely affecting BZO's ability to compete in the hand torch cylinder market.  [Complaint, Doc. 1 at ¶79].

### A.    Forecast of Evidence

In its opposition to WCW's Motion for Summary Judgment on this claim, BZO has presented a forecast of evidence to show that WCW offered much lower prices directly to Ace Hardware, at a significant margin loss, in order to take the Ace business away from BZO.  [WCW email exchanges, BZO Exs. 191, 192].  BZO also has presented a forecast of evidence that a WCW sales representative told retailers, including Do It Best, that BZO would likely be increasing its prices [Shakley Dep., BZO Ex. 103, at 228], and that consequently, numerous retailers, including Home Depot and Menard's, contacted BZO and expressed concerns regarding BZO's ability to supply cylinders in the future.  [Morrisroe Dep., BZO Ex. 155 at 132-37, 157-58, 190-91].

BZO also presented evidence that in June 2008, upon learning that BZO had sourced an alternate style of propane cylinder from Coleman and that BZO was planning the introduction of a new product line known as the

"Fat Boy" propane cylinder, WCW immediately cut off BZO's supply of oxygen cylinders, knowing that Coleman could not manufacture such cylinders and that BZO had no other source for them. [McClintock Dep., BZO Ex. 107 at 112-19; Powers emails, BZO Exs. 124 and 125].[1] BZO asserts that WCW's actions were designed to adversely affect BZO's ability to compete in the hand torch cylinder market. [Doc. 158 at 19].

## B.    Discussion

Although Count VI of BZO's Complaint is entitled "Tortious Interference With Prospective Business Relations," the allegations contained therein relate to WCW's alleged conduct directed to BZO's relationships with its *existing* customers. [Complaint, Doc. 1 at ¶79]. Tortious interference with existing contracts and tortious interference with prospective business relations (also known as tortious interference with

---

[1]BZO further asserts that WCW told Ace Hardware that if Ace decided to stay with BZO, WCW would simply cut off BZO's fuel supply and force Ace to deal directly with WCW. [Doc. 158 at 19]. To support this allegation, BZO relies upon an internal BZO email recounting this alleged exchange between WCW and Ace Hardware. [Morrisroe email, BZO Ex. 190]. WCW objects to the admissibility of this document on the grounds that it is inadmissible hearsay. [Doc. 163 at 4]. WCW's objection is well-founded. This email is clearly introduced in an attempt to prove the truth of the matter asserted therein. "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." Maryland Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991). Accordingly, this email cannot and will not be considered as part of BZO's forecast of evidence at this stage in the proceedings.

prospective advantage) are two distinct torts under North Carolina law. Regardless of the tort theory under which BZO is proceeding, however, BZO must be able to show that WCW's acts were done without justification in order to state a claim for relief.  See United Laboratories, Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) (to prove claim for tortious interference with contract, plaintiff must show that defendant intentionally induced third person not to perform contract without justification); DaimlerChrysler Corp. v. Kirkhart, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (to prove claim for tortious interference with prospective business relations, plaintiff must show that defendant induced third party to refrain from entering into contract with plaintiff without justification), disc. rev. denied, 356 N.C. 668, 577 S.E.2d 113 (2003).

"A defendant may encourage the termination of a contract 'if he does so for a reason reasonably related to a legitimate business interest.'" Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc., 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003) (quoting in part Robinson, Bradshaw & Hinson v. Smith, 129 N.C. App. 305, 318, 498 S.E.2d 841, 850 (1998)).  Engaging in competition is a legitimate business interest; therefore, as a general rule, interference with a contract is justified when the plaintiff and defendant are

engaged in competition with each other.  See S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC, 189 N.C.App. 601, 614, 659 S.E.2d 442, 452 (2008) ("Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant . . . are competitors.") (citation omitted).

BZO has presented a forecast of evidence to show that WCW offered much lower prices directly to Ace Hardware, at a significant margin loss to WCW, in order to take the Ace business away from BZO; that a WCW sales representative told retailers that BZO would likely be increasing its prices in the future; and that WCW cut off BZO's supply of oxygen cylinders, knowing that BZO's alternate fuel cylinder supplier could not manufacture them.  Assuming that BZO's forecast of evidence is true, none of these actions, taken singly or in combination, are actionable in this case.  At the time that these actions occurred, BZO and WCW were actively competing against each other in the fuel cylinder market.  WCW's attempts to take business away from BZO or to limit its ability to otherwise compete in the marketplace were justifiable acts of competition and are not actionable as acts of tortious interference.  Accordingly, WCW is entitled to judgment as a matter of law as to BZO's tortious interference claim.

## V.    BZO'S UDTPA CLAIM

BZO's UDTPA claim, as pled, rests upon three primary factual allegations: (1) that WCW engaged in unfair competition and deceptive trade practices by using the BZO trade name, trademark, and logo to mislead customers in its advertisements [Complaint, Doc. 1 at ¶72]; (2) that WCW engaged in unfair competition by interfering with BZO's customer relationships [Id. at ¶73]; and (3) that WCW engaged in unfair competition by improperly and unjustifiably raising the prices it charged to BZO for cylinders, thereby injuring BZO's ability to compete within the marketplace [Id. at ¶74].  To the extent that BZO bases its UDTPA claim on allegations of tortious interference with existing and/or prospective business relations and allegations of price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13, the Court finds for the reasons previously stated herein that WCW is entitled to summary judgment on this claim as well.  See Area Landscaping, 160 N.C. App. at 526, 586 S.E.2d at 512 ("Since the trial court properly granted summary judgment as to the trade secret claim, [the UDTPA] claim must also fail.").   For the reasons stated in open court at the December 16, 2009, hearing, and as reflected in

the Court's minute entry, summary judgment with respect to the remainder of BZO's UDTPA claim based on allegations of false advertising and trade dress infringement is denied.

## VI. WCW's FRAUDULENT INDUCEMENT COUNTERCLAIM

In its first Counterclaim, WCW contends that BZO fraudulently induced WCW to enter the 2006 Supply Agreement by: (1) falsely stating it did not intend to acquire UltraBlue; (2) falsely stating it would not compete against WCW; (3) concealing its plan to compete against WCW by giving false reasons for proposing a change to the definition of "Covered Cylinders"; and (4) failing to disclose its strategic business plans to acquire UltraBlue. [Amended Counterclaim, Doc. 35 at ¶¶5-15].[2]

---

[2]In its Response to BZO's Motion for Summary Judgment, WCW alleges that its claim of fraudulent inducement is further premised upon the theory that BZO entered the Supply Agreement with no present intent to perform its contractual obligations of best efforts and good faith. [Doc. 159 at 14]. This fraud theory was not pled in WCW's Counterclaim and was raised for the first time only after BZO moved for summary judgment. The Court will therefore not address this theory further.

## A.    Forecast of Evidence

Viewing the forecast of evidence in the light most favorable to WCW, the following is a recitation of the facts relevant to WCW's fraudulent inducement counterclaim.

During the negotiation of the 2006 Supply Agreement, BZO proposed various changes to the contract, including the addition of a lower parameter for the size of Covered Cylinders (i.e., 40 cubic inches).  After reviewing BZO's proposed changes, WCW President George Stoe ("Stoe") sent an email to BZO President Ken Goodgame ("Goodgame") expressing WCW's agreement with some of the proposed  changes and seeking clarification as to others.  Specifically, Stoe sought "to clarify the size of cylinders to be covered" by the contract.  [Goodgame-Stoe email exchange June 2, 2005, WCW Response Ex. 48].  In an email response dated June 2, 2005, Goodgame replied that most of the proposed changes were "wording and disclosure issues.  As an example: size of cylinder was added to protect our butane and micro torch fuel sourcing (from Korea) which is less than 62 cubic inches."  [Id.].  BZO's former Chief Financial Officer Brian Starrett and in-house counsel John Stipancich testified, however, that the definition of Covered Cylinders was modified not only to

exclude BZO's butane and micro torch fuel sourcing, but also to exclude UltraBlue's PowerCell cylinders in the event that BZO acquired UltraBlue in the future. [Starrett Dep., WCW Response Ex. 24 at 167-69; Stipancich Dep., WCW Response Ex. 10 at 59-60]. At no point during the subsequent negotiations did BZO reveal to WCW that the possible acquisition of UltraBlue was an additional reason for the modification of the Covered Cylinders definition. [See, e.g., Stipancich email exchange June 10, 2005, WCW Response Ex. 51].

Throughout the parties' negotiations, Stoe expressed his concern that BZO would attempt to compete with WCW in the cylinder production business. In response to these concerns, Goodgame assured Stoe that BZO "had no intention of being in the cylinder business, that they had been looking at that for a period of time and decided they weren't going to be producing cylinders." [Stoe Dep., WCW Response Ex. 57 at 78-79; see also McClintock Dep., WCW Response Ex. 6 at 210 ("Ken Goodgame commented that he had no intention to compete with us; his core competency was torches and our core competencies was [sic] cylinders.")].

The other exchange upon which WCW relies to assert its claim of fraudulent misrepresentation occurred during a breakfast meeting at some

point prior to the execution of the Supply Agreement.[3]  During this meeting, which only Goodgame and Stoe attended, Stoe expressed his concern about rumors that he had heard that BZO was considering purchasing UltraBlue.  When Stoe asked Goodgame specifically if those rumors were true, Goodgame admitted that the purchase had been considered, but that ultimately BZO "decided that it really didn't make sense for us and we didn't have an interest."  [Stoe Dep., WCW Response Ex. at 35-40].

BZO acquired UltraBlue in January 2006, many months after the alleged misrepresentations but just days after the effective date of the new Supply Agreement with WCW.  BZO then entered the market with small PowerCell cylinders in mid-2006 and began selling a quantity of PowerCell products to retail mass merchants.  WCW asserts that sales of PowerCell cylinders displaced sales of WCW-manufactured Covered Cylinders, even though the PowerCell cylinders were smaller than the WCW-manufactured Covered Cylinders.  [Pang Aff., WCW Ex. 7 at ¶6].

---

[3]When this meeting actually occurred has been a matter of some controversy in this case.  Regardless of the true date of the meeting, however, WCW has presented a forecast of evidence (which at this point must be taken as true) to show that this meeting occurred prior to the execution of the 2006 Supply Agreement.

**B.    Discussion**

Under Ohio law[4], a party asserting a claim for fraudulent inducement

must establish the following elements:

> (1) a representation or, when there is a duty to
> disclose, concealment of a fact, (2) which is material
> to the transaction at hand, (3) made falsely, with
> knowledge of its falsity, or with such utter disregard
> as to whether it is true or false that knowledge may be
> inferred, (4) with the intent of misleading another into
> relying upon it, (5) justifiable reliance on the
> representation or concealment, and (6) an injury
> proximately caused by that reliance.

Gentile v. Ristas, 160 Ohio App.3d 765, 781, 828 N.E.2d 1021, 1033

(2005).  Ohio law requires every element of a fraudulent inducement claim

to be proven through clear and convincing evidence, including on summary

judgment.  See Bradford v. B & P Wrecking Co., Inc., 171 Ohio App.3d

616, 631, 872 N.E.2d 331, 342-43 (2007); Inge v. Rock Fin. Corp., 388

F.3d 930, 938 (6th Cir. 2004) (non-moving party must meet clear and

convincing standard to survive summary judgment). "Clear and convincing

evidence has been defined as that measure or degree of proof ... which will

produce in the mind of the trier of fact a firm belief or conviction as to the

---

[4]By its terms, the Supply Agreement is governed by Ohio law.  [Supply Agreement, WCW Ex. 11E at §8.4].  The parties do not dispute that the Ohio law governs WCW's counterclaims.

facts sought to be established." Ohio State Bar Ass'n v. Reid, 85 Ohio St.3d 327, 331, 708 N.E.2d 193, 197 (1999) (citation and internal quotation marks omitted).

Under Ohio law, "when two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." Glazer v. Lehman Bros., Inc., 394 F.3d 444, 455 (6th Cir. 2005) (quoting 3A Corbin, Contracts § 573 at 357 (1960)). Ohio courts have recognized, however, that the parol evidence rule generally "does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement." Galmish v. Cicchini, 90 Ohio St.3d 22, 28, 734 N.E.2d 782, 789 (2000); Glazer, 394 F.3d at 455.

This exception to the parol evidence rule, however, "is not without limit." Citicasters Co. v. Bricker & Eckler, L.L.P., 149 Ohio. App.3d 705, 709, 778 N.E.2d 663, 666 (2002). Where a contract contains an integration clause, "[p]arties may not prove fraud by claiming that the inducement to enter into an agreement was a promise that was *within the*

20

*scope of the integrated agreement but was ultimately not included in it.*"

Bollinger, Inc. v. Mayerson, 116 Ohio App.3d 702, 712, 689 N.E.2d 62, 69 (1996) (emphasis added). As the Sixth Circuit Court of Appeals has explained:

> Although it is clear that making a contractual promise with no present intention of performing it constitutes promissory fraud in Ohio, . . . and that extrinsic evidence always is admissible to show promissory fraud, . . . a promissory fraud theory may not be used to impose *additional obligations* upon a party to a written contract containing an integration clause.

Coal Res., Inc. v. Gulf & Western Indus., 756 F.2d 443, 446 (6th Cir. 1985) (emphasis added). To allow otherwise "would completely defeat the purpose of an integration clause." Lewelling v. Farmers Ins. of Columbus, Inc., 879 F.2d 212, 217 (6th Cir. 1989) (quoting Coal Res., 756 F.2d at 447).

In the present case, the parties' Supply Agreement is a fully integrated document. Section 8.2 of the Agreement specifically provides as follows:

> Entire Agreement. Effective on the Effective Date, this Agreement embodies the entire understanding, superseding all prior oral or written agreements (including but not limited to the 2001 Agreement), understandings, negotiations and correspondence

> between the parties concerning the continuing relationship between the parties and the purchase/sale of Covered Cylinders during the term of this Agreement. There are no conditions to this Agreement which are not set forth herein; and no additional or different terms set forth in either party's purchase order, quotation, order acknowledgement, invoice or other forms or correspondence shall be of any force or effect with respect to the purchase/sale of Covered Cylinders during the term of this Agreement.

[Supply Agreement, WCW Ex. 11E at §8.2].

The substance of BZO's alleged misrepresentations are clearly within the scope of the parties' integrated Agreement but were not included within it. The Supply Agreement sets out the scope and nature of the parties' rights and obligations to buy and sell cylinders to and from one another. The Agreement specifically gave WCW the exclusive right to manufacture "Covered Cylinders," that is, hand torch cylinders between 40 and 70 cubic inches. The Agreement further gave WCW the right of first refusal to manufacture any differently sized cylinder used by BZO for hand torches in the future, *but only if that cylinder was greater than 40 cubic inches*:

> In the event that BernzOmatic develops, begins to use and/or has requirements for other cylinders having an internal volume greater than 40 cubic inches that are designed to be used primarily for hand torches in the same or similar manner as a Covered

> Cylinder, WCW shall have the right of first refusal to manufacture such cylinders for BernzOmatic and to include such cylinders as Covered Cylinders for purposes of this Agreement.

[Id. at §6.1]. This provision does not limit in any way BZO's ability to manufacture and sell a cylinder that is less than 40 cubic inches, even if that cylinder directly competed with WCW's product. By claiming that BZO orally promised not to acquire UltraBlue and not to compete with WCW by selling a sub-40-cubic-inch cylinder, WCW attempts to vary the parameters of the parties' integrated agreement with misrepresentations that are promissory in nature. The parol evidence rule bars such a claim. See Bollinger, 116 Ohio App.3d at 712, 689 N.E.2d at 69.

To the extent that WCW relies upon certain material *omissions* of BZO's strategic business plans to show fraudulent inducement, this claim also fails. In order to prevail on a fraudulent inducement claim based upon BZO's failure to disclose its strategic business plans, WCW must show that BZO had a duty to disclose such plans. See Gentile, 160 Ohio App.3d at 781, 828 N.E.2d at 1033. "The duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Steinfels v.

Ohio Dep't of Commerce, Div. of Sec., 129 Ohio App.3d 800. 807, 719

N.E.2d 76, 82 (1998). "It is well established that a manufacturer-distributor

relationship, absent more, does not give rise to a fiduciary relationship."

OKI Distrib., Inc., v. Amana Refrigeration, Inc., 850 F.Supp. 637, 647 (S.D.

Ohio 1994) (collecting cases). "Nor does a fiduciary relationship exist

between parties negotiating an arm's-length commercial transaction." See

Landskroner v. Landskroner, 154 Ohio App.3d 471, 485, 797 N.E.2d 1002,

1013 (2003).

In the present case, WCW and BZO were sophisticated corporate

parties, represented by counsel, engaged in an arms-length contractual

negotiation. Under these circumstances, no reasonable jury could

conclude that a fiduciary or similar relationship existed between the parties

such that BZO would have had any obligation to disclose its strategic

business plans to WCW. Therefore, BZO's failure to disclose its plans to

acquire UltraBlue did not constitute a fraudulent omission under Ohio law.

WCW also has failed to present a forecast of evidence to establish

that any misrepresentation or omission made by BZO was "material to the

transaction at hand." Gentile, 160 Ohio App.3d at 781, 828 N.E.2d at

1033. A fact is material if it is likely to "affect the conduct of a reasonable

person with reference to the transaction." <u>Leal v. Holtvogt</u>, 123 Ohio App.3d 51, 76, 702 N.E.2d 1246, 1262 (1998) (citation omitted).

WCW has failed to present a forecast of evidence that BZO's alleged misrepresentations or omissions were material. Despite its professed concerns that BZO would acquire UltraBlue and begin marketing a competitive sub-40-cubic-inch product, WCW took no steps to include a non-competition clause in the Agreement or to otherwise alter the lower parameter of Covered Cylinders to encompass cylinders the size of the PowerCell cylinders. If BZO's alleged oral promises not to compete with WCW or not to buy UltraBlue were as material as WCW now claims, WCW could have easily included provisions addressing such concerns within the Supply Agreement, but for whatever reason, it did not insist on doing so. In light of this forecast of evidence, no reasonable jury could conclude that such representations were material to the parties' transaction.

In order to survive summary judgment, WCW also must present a forecast of evidence that it justifiably relied on the alleged representations or concealment. <u>See</u> <u>Gentile</u>, 160 Ohio App.3d at 781, 828 N.E.2d at 1033. Whether a party's reliance on a misrepresentation or omission is justifiable depends on "the nature of the transaction, the form and

25

materiality of the representation, the relationship of the parties and their respective means and knowledge, as well as other circumstances." Johnson v. Church of the Open Door, 179 Ohio App.3d 532, 902 N.E.2d 1002, 1007 (2008) (citation omitted).

In the present case, WCW has failed to present a forecast of evidence that its reliance upon BZO's alleged misrepresentations or omissions was justifiable. According to WCW's forecast of evidence, WCW knew of rumors that BZO was attempting to acquire UltraBlue, and WCW had concerns that this acquisition would lead BZO to compete directly with WCW's products. When WCW asked about these rumors, BZO assured WCW that it had no intention to acquire UltraBlue and that it would not compete with WCW in the sale of Covered Cylinders. Despite WCW's professed concerns regarding the effect of UltraBlue's acquisition and the alleged importance that such acquisition not occur, however, WCW continued to negotiate a contract which in no way limited BZO's ability to acquire UltraBlue or to seek alternate sources for cylinders less than 40 cubic inches in volume. WCW further agreed to the integration clause stating that the Supply Agreement constituted the entirety of the agreements between the parties. In light of this evidence, no reasonable

jury could possibly conclude that WCW's reliance on BZO's alleged oral misrepresentations or omissions was justified.

For all these reasons, BZO is entitled to judgment as a matter of law as to WCW's fraudulent inducement claim.


## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that:

(1)    Defendants' Motion for Summary Judgment [Doc. 148] is **GRANTED** with respect to BZO's claims for tortious interference with contract and for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, et seq., as related to the allegations of tortious interference and price discrimination in violation of the Robinson-Patman Act.  In all other respects, Defendants' Motion for Summary Judgment [Doc. 148] is **DENIED**.

(2)    Plaintiffs' Motion for Summary Judgment [Doc. 150] is **GRANTED** with respect to Defendants' fraudulent

inducement counterclaim.  In all other respects, Plaintiffs'

Motion for Summary Judgment [Doc. 150] is **DENIED**.

**IT IS SO ORDERED**.

Signed: February 12, 2010

Martin Reidinger
United States District Judge