# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### CIVIL CASE NO. 3:08cv291

IRWIN INDUSTRIAL TOOL COMPANY,  )
d/b/a BernzOmatic and NEWELL  )
OPERATING COMPANY,  )
  )
      Plaintiffs,  )
  )
  )   **MEMORANDUM OF**
      vs.  )   **DECISION AND**
  )   **ORDER**
  )
WORTHINGTON CYLINDERS WISCONSIN,  )
LLC, WORTHINGTON CYLINDER  )
CORPORATION, and WORTHINGTON  )
INDUSTRIES, INC.,  )
  )
      Defendants.  )
_____)

**THIS MATTER** is before the Court on the following motions:

(1)    Defendants' Motion for Judgment as a Matter of Law or

for New Trial [Doc. 306];

(2)    BernzOmatic's Motion for Entry of a Permanent Injunction

[Doc. 299];

(3)    BernzOmatic's Motion to Set Amount of Prejudgment

Interest and Amend the Judgment Accordingly [Doc. 301];

and

Dockets.Justia.com

(4)     BernzOmatic's Rule 54(d) Motion for Attorneys' Fees

        [Doc. 303].


I.      **PROCEDURAL BACKGROUND**

        This action arises out of a Supply Agreement between the Plaintiff

Irwin Industrial Tool Company d/b/a BernzOmatic ("BernzOmatic") and the

Defendant Worthington Cylinders Wisconsin, LLC ("Worthington")[1] for the

supply of fuel cylinders.  In its Complaint, BernzOmatic alleged various

claims arising from Worthington's purported breach of the parties' contract,

as well as claims for violations of the Lanham Act, 15 U.S.C. §§ 1051, <u>et</u>

<u>seq.</u>; unfair and deceptive trade practices, in violation of N.C. Gen. Stat. §§

75-1.1, <u>et seq.</u> ("Chapter 75"); and tortious interference with prospective

business relations in violation of North Carolina law.[2]  [Complaint, Doc. 1].

Worthington, in turn, asserted counterclaims for fraudulent inducement and

breach of contract.  [Amended Counterclaim, Doc. 35].

_____

        [1]Worthington Cylinder Corporation and Worthington Industries, Inc. were also named as defendants in this action.  The Court shall refer to all of the defendants collectively as "Worthington."

        [2]BernzOmatic also asserted a claim for unlawful price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13, but this claim was voluntarily dismissed on January 14, 2010.  [Doc. 170].

On February 12, 2010, the Court granted Worthington summary judgment as to BernzOmatic's claim for tortious interference with contract and for unfair and deceptive trade practices under Chapter 75, as related to the allegations of tortious interference and price discrimination. The Court further granted BernzOmatic summary judgment with respect to Worthington's fraudulent inducement counterclaim. [Order, Doc. 242].

This case proceeded to a trial by jury on February 16, 2010. On February 26, 2010, the jury returned a verdict finding that Worthington had breached the Supply Agreement and awarding BernzOmatic $1,284,003 for the breach of contract arising from Worthington's unauthorized use of BernzOmatic's trade name, trademarks, and logos in violation of § 4.3 of the Supply Agreement and $11,718,242 for other breaches of contract. The jury further found that Worthington had engaged in willful trade dress infringement and false advertising in violation of the Lanham Act and Chapter 75 and awarded BernzOmatic damages in the amount of $1.00 on these claims. [Verdict Sheet, Doc. 293]. The Court entered a Judgment in accordance with the jury's verdict on April 14, 2010. [Judgment, Doc. 294]. Thereafter, the parties filed the motions which are presently pending before the Court. A hearing was held on these motions on August 30, 2010.

## II.  DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR NEW TRIAL

Worthington moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A) on the "other" contract damages awarded to BernzOmatic and for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) on BernzOmatic's claims for breach of § 4.3 of the Supply Agreement and for violations of the Lanham Act and Chapter 75. [Doc. 306].

### A.  Motion for Judgment as a Matter of Law

#### 1.  Standard of Review

A jury verdict will withstand a Rule 50(b) motion unless the nonmovant has presented no substantial evidence to support the jury verdict.  Stamathis v. Flying J, Inc., 389 F.3d 429, 436 (4th Cir. 2004).  A Rule 50 motion for judgment as a matter of law is reviewed under the same standard as that applied in reviewing a motion for summary judgment. Thus, in considering Worthington's motion, the Court must view the evidence in the light most favorable to BernzOmatic and draw all reasonable inferences in its favor.  See Dennis v. Columbia Collerton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002).  A verdict may not be set aside unless the Court "determines that the only conclusion a reasonable

trier of fact could draw from the evidence is in favor of the moving party."

Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc., 87

F.3d 654, 656-57 (4th Cir. 1996) (quoting Winant v. Bostic, 5 F.3d 767, 774

(4th Cir. 1993)).

### 2. Analysis

#### a. Unauthorized Use of Trade Names

The jury found that Worthington had breached § 4.3 of the Supply

Agreement by using BernzOmatic's trade names, logos, and trademarks

without authorization and awarded BernzOmatic $1,284,003 in damages.

[Doc. 293 at 2]. Worthington argues that it is entitled to judgment as a

matter of law with respect to this breach of contract claim for three reasons.

First, Worthington argues that the jury's award is not supported by the

evidence. Second, Worthington contends that a contractual limitation on

damages within the Supply Agreement precludes recovery by BernzOmatic

for lost profits. Third, Worthington argues that BernzOmatic cannot recover

for the unauthorized use of the trade names, logos, and trademarks at

issue because it failed to prove ownership of such marks. [Doc. 307 at 4-

9].

Worthington failed to assert the first two of these arguments in its Rule 50(a) pre-verdict motion. In arguing for judgment as a matter of law on this claim, Worthington raised only the issue of the ownership of the trade names, trademarks or logos at issue. [See Doc. 290, Feb. 24, 2010 Trial Transcript ("Trial Tr.") at 2038-39]. To raise an issue in a post-verdict motion for judgment as a matter of law, a party must preserve that right by first making an appropriate motion under Rule 50(a). Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc., 994 F.Supp. 350, 376 (W.D.N.C. 1997). Having failed to raise these issues in its pre-verdict motion, Worthington is precluded from raising them post-verdict. See id.

Even if Worthington had preserved these arguments, the Court finds that there is substantial evidence to support the jury's damage award for this breach of contract claim. Specifically, BernzOmatic presented evidence of Worthington's use of the three-panel "peel away" ad, which impermissibly used BernzOmatic's cylinder and label, including the black "Circle of Trust" logo. BernzOmatic also introduced substantial evidence showing that beginning in March 2007, Worthington discarded its existing label it had been using for its cylinders and switched to a new label that copied the "Circle of Trust" logo and was virtually identical to

6

BernzOmatic's label. [Plaintiffs' Trial Exs. 36 and 208; Doc. 268, Feb. 18, 2010 Trial Tr. at 621-23 (McClintock Video); Doc. 286, Feb. 23, 2010 Trial Tr. at 1739-41 (Shakley)]. The evidence further showed that Worthington aggressively used the packaging incorporating the "Circle of Trust" logo in marketing and selling its hand torch cylinders. For example, Worthington photographed Worthington's new infringing "black circle" cylinder on shelves next to BernzOmatic's with the labels juxtaposed, and sent those photographs to retail store customers like Ace, True Value, and Canadian Tire. [Plaintiffs' Trial Exs. 38, 39 & 40]. Worthington told those potential customers that "Worthington cylinders are replacing BernzOmatic labels as a rolling change" and directed them to "notice our cylinders next to the BernzOmatic label." [Id.; Doc. 266, Feb. 17, 2010 Trial Tr. at 226-31 (Morrisroe)]. Based on this evidence, the jury reasonably found that Worthington breached § 4.3 of the Supply Agreement.

Worthington also claims there was no proof of damages causation. Worthington's causation argument, however, is premised on the theory that the "peel away" ad was the only way in which Worthington breached § 4.3. As noted above, however, there was substantial evidence presented at trial to show that not only did Worthington use BernzOmatic's logo in its "peel

away" ad, but that following the termination of the Supply Agreement, Worthington specifically and intentionally used BernzOmatic's "Circle of Trust" logo design on its cylinders. [Doc. 266, Feb. 17, 2010 Trial Tr. at 225 (Morrisroe)].

Worthington's second argument is that the $1,284,003 damages award is barred by a contractual limitation in § 4.8 of the Supply Agreement. That section precludes the recovery of consequential or incidental damages "in connection with design, manuf[a]cture, or sale of covered cylinders under [the] agreement, whether for breach of warranty or other contract breach, negligence or other tort, or any strict liability theory." [Supply Agreement § 4.8, Plaintiffs' Trial Ex. 1]. As the Court previously has recognized and ruled, § 4.8 applies only to awards of incidental or consequential damages. The $1,284,003 in lost profits are *direct* damages resulting from Worthington's breach of § 4.3 and are therefore not precluded by this contractual provision. Additionally, § 4.8 applies only "in connection with design, manufacture or sale of covered cylinders," not with respect to Worthington's unauthorized use of BernzOmatic's trade names, logos, and trademarks in its sale of competing cylinders. Accordingly, this

contractual provision does not preclude the recovery of these damages in this case.

Worthington further contends that it is entitled to judgment as a matter of law on this claim because BernzOmatic failed to prove that it owns the trade names, logos, and trademarks under § 4.3 of the Supply Agreement. Contrary to Worthington's contentions, however, there was sufficient evidence presented from which the jury reasonably could conclude that BernzOmatic in fact developed, used, and owned "trade names, logos, and trademarks," particularly the black "Circle of Trust" logo, within the meaning of § 4.3 of the Supply Agreement. Contrary to Worthington's contention, BernzOmatic was not required to formally register its claim to any BernzOmatic trade name, logo or trademark in order to seek redress for any unauthorized use of the same by Worthington under § 4.3 of the Supply Agreement. Further, while Worthington contends that Newell Operating Company in fact owned the intellectual property at issue, no evidence of this was adduced at trial. Worthington's motion for judgment as a matter of law with respect to this breach of contract claim is therefore denied.

**b.    Trade Dress Infringement and False Advertising**

Next, Worthington contends that it is entitled to judgment as a matter of law regarding the jury's findings that it willfully violated the Lanham Act and Chapter 75 because the evidence at trial did not show a violation of either statute, let alone willful violations.  [Doc. 307 at 19-26].

In order to prove a claim for trade dress infringement under the Lanham Act, a plaintiff must show that: "(1) its trade dress is primarily non-functional; (2) the alleged infringement creates a likelihood of confusion; and, (3) the trade dress either (a) is inherently distinctive, or (b) has acquired a secondary meaning."  Ashley Furniture Industries, Inc. v. SanGiacomo N.A. Ltd., 187 F.3d 363, 368 (4th Cir. 1999).  Here, Worthington contends that BernzOmatic failed to provide at trial any evidence of non-functionality or secondary meaning of the BernzOmatic trade dress.

Generally speaking, trade dress is considered non-functional if it is not essential to the use or purpose of the product or if it does not affect the cost or quality of the product.  See Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).  In the present case, BernzOmatic submitted substantial evidence to show that its trade

dress -- including the color, size, and shape of the cylinder and the color, font, and placement of words and symbols on the cylinder label -- was non-functional.   [See Doc. 274, Feb. 19, 2010 Trial Tr. at 936 (McClintock) (Magna propane sold in red cylinder); Doc. 264, Feb. 17, 2010 Trial Tr. at 331 (Morrisroe) ("Coleman uses green to designate their propane cylinders."); Id. at 359-60 (Ridley); Doc. 280, Feb. 22, 2010 Trial Tr. at 1353 (Raboin); Plaintiffs' Trial Exs. 43, 80, 81, 162 (Compressed Gas Association: "Color shall not be used to identify container content."); Doc. 266, Feb. 17, 2010 Trial Tr. at 209 (Morrisroe) (discussing shape of camping propane gas cylinder); Doc. 264, Feb. 17, 2010 Trial Tr. at 480 (Read) (discussing shape of Fat Boy cylinder); Doc. 274, Feb. 19, 2010 Trial Tr. at 902 (McClintock) (discussing shape of PowerCell cylinder); Plaintiffs' Trial Exs. 187, 188].

Worthington argues that BernzOmatic abandoned any trade dress packaging claim it had been asserting and proceeded to trial solely on a claim based on product configuration.  As such, Worthington contends, BernzOmatic was required under Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) to produce evidence of secondary meaning in order to prevail on its trade dress

infringement claim but failed to do so. First and foremost, Worthington's argument that BernzOmatic abandoned any "packaging" trade dress claim is without merit. While it is true that BernzOmatic withdrew any claim it had based on the infringement of the trade dress embodied in its *kit* packaging, BernzOmatic continued to maintain throughout trial that the cylinder itself, along with the cylinder label, was packaging trade dress. [See Doc. 286, Feb. 23, 2010 Trial Tr. at 1831]. In any event, whether BernzOmatic in fact asserted a product configuration claim or a product packaging claim is a moot point, as BernzOmatic presented substantial evidence at trial that its trade dress had acquired distinctiveness through secondary meaning. The Fourth Circuit has held that "evidence of intentional, direct copying establishes a prima facie case of secondary meaning . . . ." M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 448 (4th Cir. 1986). At trial, BernzOmatic presented evidence to show that the Worthington intentionally copied BernzOmatic's trade dress. Worthington's cylinder was nearly identical to the BernzOmatic cylinder in shape, size, and color. Furthermore, the label used on the Worthington incorporated nearly identical colors and font, as well as the black "Circle of Trust" design, rendering the label virtually indistinguishable from the BernzOmatic label.

In light of the substantial evidence submitted to show that the Worthington cylinder was an intentional copy of the BernzOmatic cylinder, the Court further finds that there was substantial evidence to establish a likelihood of confusion between the two products.  "[C]ourts have almost unanimously presumed a likelihood of confusion upon a showing that the defendant intentionally copied the plaintiff's trademark *or* trade dress." Larsen v. Terk Technologies Corp., 151 F.3d 140, 149 (4th Cir. 1998).  For these reasons, the Court concludes that there is substantial evidence to support the jury's finding of willful trade dress infringement in violation of the Lanham Act and Chapter 75.

Worthington further argues that BernzOmatic's false advertising claim fails as a matter of law because BernzOmatic did not produce any evidence that Worthington's three-panel ad actually deceived or had the tendency to deceive consumers.  This argument must be rejected.  In order to sustain a claim for false advertising, a plaintiff must prove that "the contested statement or representation [is] either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context."  Scotts Co. v. United Industries Corp., 315 F.3d 264, 273 (4th Cir. 2002) (citation and internal quotation marks omitted).  In

the present case, BernzOmatic presented sufficient evidence from which the jury could find that the statements in Worthington's three-panel ad were literally false. "Where the advertisement is literally false, a violation may be established without evidence of consumer deception." Id. (citation and internal quotation marks omitted). Thus, the lack of evidence regarding any consumer deception is not fatal to BernzOmatic's claim. For these reasons, Worthington's motion for judgment as a matter of law regarding BernzOmatic's false advertising claim under the Lanham Act and Chapter 75 must be denied.

## B. Motion for New Trial

### 1. Standard of Review

Pursuant to Rule 59 of the Federal Rules of Civil Procedure, the Court may grant a new trial to any party on all or some of the issues if: "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998) (quoting Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)). In reviewing a motion for

a new trial, the Court may not "retry factual findings or credibility determinations reached by the jury." Cline, 144 F.3d at 301. Instead, the Court must "assume that testimony in favor of the non-moving party is credible, unless totally incredible on its face, and ignore the substantive weight of any evidence supporting the moving party." Id. (internal quotation marks and citation omitted). The decision to grant or deny a motion for a new trial is a matter within the Court's discretion. Atlas, 99 F.3d at 594.

### 2.    Analysis

#### a.    Award of Cover Damages

Worthington first argues that the jury's award of cover damages is contrary to the evidence and warrants a new trial. Specifically, Worthington argues that BernzOmatic was not entitled to seek cover damages because Worthington never failed to make delivery or refused to sell cylinders to BernzOmatic. Additionally, Worthington contends that BernzOmatic began purchasing Coleman cylinders not as cover but as a competitive strategy to convert the market from the Worthington-manufactured cylinder to a Coleman-manufactured cylinder. For these reasons, Worthington argues, BernzOmatic was not entitled to recover cover damages. [Doc. 307 at 10-13].

First, it must be noted that it is unclear whether cover damages were even awarded, as only a general contract damages issue was submitted to the jury.[3] BernzOmatic argued that it was entitled to cover damages of $1,283,428, but there is no basis for Worthington to assert that this was, in fact, awarded. The Court, therefore, takes Worthington's argument to mean that it is entitled to a new trial because BernzOmatic advocated to be awarded cover damages and that such request was improper.

Under Ohio law, which governs the contract in this case, a buyer may seek cover damages "[w]here the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved." Ohio Rev. Code Ann. § 1302.85(A). Here, Worthington clearly repudiated the Supply Agreement by terminating it on January 27, 2007, and by refusing to sell Covered Cylinders to BernzOmatic in accordance with its terms. Because no other manufacturer could supply the volume of tall, skinny cylinders required of BernzOmatic at the time that Worthington terminated the Supply Agreement [Doc. 269, Feb. 18, 2010 Trial Tr. at 662 (Torres)], BernzOmatic was forced to buy

---

[3]A separate damages issue was submitted to the jury on the issue of Worthington's unauthorized use of trade names, logos, and trademarks, because lost profit damages were available for this breach of contract but were not available with respect to the other alleged breaches of contract.

16

cylinders from Worthington at the prevailing market prices in substitution for the cylinders that Worthington refused to sell at the Supply Agreement prices. [Doc. 266, Feb. 17, 2010 Trial Tr. at 208-09 (Morrisroe)]. In light of this price increase, as well as Worthington's decision to cut off BernzOmatic's supply of camping gas cylinders, BernzOmatic began a worldwide search for a new cylinder supplier, and it eventually determined that Coleman's "Fat Boy" cylinder was the best available substitute. [Doc. 269, Feb. 18, 2010 Trial Tr. at 662-67 (Torres)].

Worthington argues that given its shape, size and price, the Coleman cylinder was not a reasonable substitute for the Worthington cylinder. Substitute goods obtained as cover need not be identical but rather must be "commercially usable as reasonable substitutes under the circumstances of the particular case." Ohio Rev. Code Ann. § 1302.86, Official Comments, n.2. "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." Id. "Whether cover provides a reasonable substitute under the circumstances is a question of fact." Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060,

1066 (Fed. Cir. 2001). Here, BernzOmatic presented substantial evidence from which the jury could find that the Coleman cylinder was commercially usable as a reasonable substitute for the Worthington cylinder under the circumstances. There is substantial evidence to support BernzOmatic having made the argument that it was entitled to cover damages and to the extent that the jury's award may have included such cover damages, it is proper. The Court will therefore deny Worthington's motion for a new trial on this issue.

### b.    "Pass Through" of Price Increase

Next, Worthington argues that the award of contract damages created a windfall to BernzOmatic because the jury failed to exclude the price increases that BernzOmatic passed on to its customers. Specifically, Worthington contends that Ohio Rev. Code Ann. § 1301.06, which states that UCC remedies should be "liberally administered" so that the aggrieved party is only "put in as good a position as if the other party had fully performed," requires the reduction of BernzOmatic's cover damages to account for the amount that BernzOmatic "passed through" to its customers through increased resale prices. [Doc. 307 at 13-18]. This argument must be rejected.

Under Ohio law, "[t]he buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . but less expenses saved in consequence of the seller's breach."  Ohio Rev. Code Ann. § 1302.86(B).  Section 1302.86 does not limit the buyer's recovery for any price increase that the buyer may "pass through" to its customers.  "If the buyer, after covering, makes a gain or sustains a loss on resale, it does not affect the measure of damages which the buyer may recover from the seller, which remains basically fixed at the difference between the contract price and the cover price."  4A Lawrence's Anderson on the Uniform Commercial Code § 2-712:62 (3d ed.).  Therefore, damages for cover are "not to be reduced by U.C.C. § 1-106 to the actual loss of the buyer and, therefore, is not to be reduced because the buyer's resale contract passes on some of the buyer's costs to the subpurchaser."  Id.

The cases cited by Worthington in support of its argument are inapposite to the case at bar.  These cases involve situations where, unlike here, the plaintiff had contractually guaranteed itself a fixed amount of profit upon resale of the products.  See Diversified Energy, Inc. v. Tennessee Valley Auth., 339 F.3d 437, 446-47 (6th Cir. 2003); Union Carbide Corp. v.

Consumers Power Co., 636 F.Supp. 1498, 1503 (E.D. Mich. 1986); Allied

Canners & Packers, Inc. v. Victor Packing Co., 162 Cal. App. 3d 905, 907,

912 (1984).  By contrast, BernzOmatic did not have contracts with its

customers establishing a fixed selling price, nor did it have a "locked in"

profit.   BernzOmatic was free to sell cylinders at any price it chose, and

thus was in a position to reap the reward of extra profits resulting from

higher prices or bear the risk of losing sales when its prices increased

beyond what the market would bear.

For these reasons, the Court rejects Worthington's "pass through"

argument.

### c.    Reasonable Amount of Damages

Finally, Worthington argues that a new trial is warranted because the

award of damages awarded for "other" breaches of contract is inconsistent

with any calculation of damages presented to the jury.  Specifically,

Worthington contends that the amount awarded by the jury on these

claims, $11,718,242, "cannot be squared" with the $12,516,944 in

damages originally sought by BernzOmatic.  [Doc. 307 at 18-19].

Worthington's argument is specious and must be rejected.  Juries are

allowed to award damages in any amount that is supported by the

evidence, even if that amount is less than the full amount that a plaintiff requests.  See, e.g., First Union Commercial Corp. v. GATX Capital Corp., 411 F.3d 551, 557-58 (4th Cir. 2005).  If Worthington's argument were correct, a defendant would be entitled to a new trial anytime that a jury awarded anything less than the total amount sought by the plaintiff.  This is not, and cannot be, the law.

In the present case, BernzOmatic presented substantial evidence to support its claims for breach of contract.  The jury found in favor of BernzOmatic and awarded damages in an amount that it found was supported by that evidence.  The fact that the jury did not award BernzOmatic every dollar it asked for does not mean that the award is not supported by the evidence.  Worthington's motion for a new trial must be denied.


**III.    BERNZOMATIC'S MOTION FOR PERMANENT INJUNCTION**

BernzOmatic moves for entry of a permanent injunction pursuant to the Lanham Act and the UDTPA which would (1) require Worthington to recall all infringing cylinders remaining on retailers' shelves; (2) require Worthington and BernzOmatic to draft and send a joint letter to major

retailers correcting Worthington's false advertisements as to its hand torch cylinder manufacturing and sales history; and (3) bar Worthington from copying BernzOmatic's "Circle of Trust" logo on any product or running false advertisements about its hand torch cylinder manufacturing and sales history. [Doc. 299 at 1-2]. Worthington opposes BernzOmatic's motion, arguing that the proposed injunction is unnecessary, unduly burdensome, and unsupported by the facts or the law. [Doc. 313 at 1-3].

The Supreme Court has established a four-factor test that a plaintiff must satisfy before a court may grant permanent injunctive relief. Specifically, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). The decision to grant or deny permanent injunctive relief is a matter within the Court's discretion. Id.

        In the present case, BernzOmatic introduced evidence at trial that Worthington intentionally copied BernzOmatic's trade dress, thereby giving

rise to a presumption of a likelihood of confusion.  Based upon the

evidence presented, the jury found that Worthington had engaged in trade

dress infringement and that Worthington's infringement was willful.  [Jury

Verdict, Doc. 293 at 3-4].  "[O]nce the plaintiff establishes a likelihood of

confusion, it is ordinarily presumed that the plaintiff will suffer irreparable

harm if injunctive relief is not granted."  Vision Sports, Inc. v. Melville Corp.,

888 F.2d 609, 612 n.3 (9th Cir. 1989); see also Logan Graphic Products,

Inc. v. Textus USA, Inc., No. 02 C 1823, 2003 WL 21011746, at *6 (N.D. Ill.

May 5, 2003) ("When dealing with trade dress infringement, an inadequate

remedy at law and irreparable harm are nearly always presumed.").[4]

A similar presumption of irreparable harm also may arise in false

advertising cases under the Lanham Act, although, as the Fourth Circuit

has noted, "there seems to be some disagreement among the courts as to

when the presumption should be applied."  Scotts Co. v. United Indus.

Corp., 315 F.3d 264, 273 (4th Cir. 2002).  The Eighth Circuit has suggested

---

[4]Worthington contends that eBay v. MercExchange, L.L.C., 547 U.S. 388, 126
S.Ct. 1837, 164 L.Ed.2d 641 (2006), eliminated the presumption of irreparable harm
upon a showing of a likelihood of confusion, and therefore, BernzOmatic cannot show
irreparable harm in this case.  Contrary to Worthington's contention, however, eBay
does not discuss, much less eliminate, the presumption of irreparable harm in this
context.  In eBay, the Supreme Court rejected the notion that an injunction *automatically*
should follow a determination of a patent or copyright infringement, and it reaffirmed the
traditional four-factor test for injunctive relief that the Court applies herein.  See 547
U.S. at 392-93, 126 S.Ct. 1837.

that the presumption applies in all Lanham Act cases where the plaintiff has established a tendency to deceive.  See United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1183 (8th Cir. 1998).  The Second Circuit, on the other hand, has limited the presumption only to cases involving false comparative advertising.  See Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 696 (2d Cir. 1994).  While the Fourth Circuit has not weighed in on the issue, district courts within the Fourth Circuit have applied the presumption of irreparable harm to non-comparative false advertisements. See Sanderson Farms, Inc. v. Tyson Foods, Inc., 547 F.Supp.2d 491, 503-04 (D. Md. 2008) (finding irreparable harm in non-comparative advertisement based on literal falsity and customer confusion); JTH Tax, Inc. v. H&R Block E. Tax Servs., Inc., 128 F.Supp.2d 926, 948 (E.D. Va. 2001) (vacated in part on other grounds) (finding irreparable harm based on non-comparative advertisement's tendency to deceive); Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc., 26 F.Supp.2d 834, 862 (E.D. Va. 1998) (finding advertisement's tendency to mislead satisfied irreparable harm requirement).

In the present case, BernzOmatic introduced evidence at trial to show that Worthington's advertisement was literally false.  Based upon the

evidence presented, the jury determined that Worthington willfully engaged in false advertising. [Jury Verdict, Doc. 293 at 3-4]. This determination necessarily involved a finding that Worthington's advertisements "actually deceived or had the tendency to deceive a substantial segment of Worthington's audience." [See Doc. 288, Feb. 25, 2010 Trial Tr. at 2185]. As such, a presumption arises that BernzOmatic has suffered irreparable harm as a result of Worthington's false advertising.

Worthington contends that because it has discontinued using the infringing trade dress and false advertisements, there is no evidence on which to base a presumption of irreparable harm in the future. This argument, however, does not foreclose the possibility of injunctive relief. As the Fourth Circuit has recognized, a defendant's "voluntary discontinuance of challenged activities" does not necessarily moot a request for injunctive relief unless "there is *no* reasonable expectation that the wrong will be repeated." Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 800 (4th Cir. 2001) (citation and internal quotation marks omitted). A defendant has "a heavy burden to establish mootness in such cases because otherwise they would simply be free to return to their old

ways after the threat of a lawsuit has passed." Id. (citation and internal quotation marks omitted).

Although Worthington has used a non-infringing trade dress on its hand torch cylinders since early 2008, Worthington could revert to the use of its infringing packaging at any time. Moreover, Worthington continues to sell to the retailers to whom it targeted its false advertising and could redistribute its false advertisements to these retailers at any time, thereby causing further irreparable injury to BernzOmatic's reputation and goodwill. Having been found by a jury to have committed willful trade dress infringement and false advertising, Worthington has failed to meet its heavy burden of showing that there is "no reasonable expectation" that it will not repeat these wrongs in the future.

For these reasons, the Court concludes that BernzOmatic has satisfied the requisite showing of irreparable harm. Money damages alone would not suffice to remedy the harm to BernzOmatic's reputation and goodwill as a result of Worthington's conduct. Accordingly, the Court concludes that BernzOmatic has satisfied the first two eBay factors.

Next, the Court must consider whether the balance of hardships weighs in favor of an injunction. The Court finds that BernzOmatic's

request for a mandatory recall of all infringing cylinders remaining on retailers' shelves would place a substantial burden on Worthington and its customers, due to the fact that a recall would be highly unlikely to result in the recovery of any infringing cylinders. First, Worthington has presented evidence to show that it sold comparatively few of the infringing cylinders. [Declaration of Dustan McClintock ("McClintock Decl."), Doc. 313-6 at ¶2 (noting that only 1.6 million of the infringing cylinders were sold)]. Additionally, in the period of time since early 2008 when Worthington replaced the infringing cylinder with the ProGrade brand, Worthington's customers have turned over their inventories at least seven to fifteen times. [Id. at ¶3]. It is therefore highly unlikely that there are currently any Worthington cylinders with infringing trade dress left to be recalled from Worthington's customers. [Id. at ¶3]. A mandatory recall would impose an undue burden upon Worthington's mass market retail customers to make what is likely to be a futile search of every store and distribution center for infringing cylinders.[5] For these reasons, the Court concludes that the

---

[5]In support of its request for a mandatory recall, BernzOmatic cites the trial testimony of one BernzOmatic employee who purchased an infringing Worthington cylinder at an unidentified local hardware store in Charlotte shortly before trial [Doc. 266, Feb. 17, 2010 Trial Tr. at 217 (Morrisroe)] and another employee who testified that "sometime within the . . . month" before trial, he saw the infringing cylinder "in stores" [Doc. 264, Feb. 17, 2010 Trial Tr. at 356 (Ridley)]. Proof that some infringing cylinders were spotted at some unidentified stores, however, is hardly indicative of a present

hardship placed on Worthington and its customers outweighs any harm that BernzOmatic may suffer in the absence of a mandatory recall of any infringing cylinders.

Similarly, the Court finds that the balance of hardships would not weigh in favor of requiring Worthington to issue a joint letter with BernzOmatic to major retailers correcting its false advertisements. Corrective advertising is typically used in cases where the advertisement at issue involved statements that create a danger to the general public. See Wildlife Research Center, Inc. v. Robinson Outdoors, Inc., 409 F.Supp.2d 1131, 1138 (D. Minn. 2005) ("Injunctive relief in the form of corrective advertising is often granted in cases involving public health or welfare.") (collecting cases). No such danger to the public health or welfare is implicated here. Additionally, "[c]orrective advertising is a remedy designed to 'counteract the public confusion' resulting from trademark infringement." Lurzer GMBH v. American Showcase, Inc., 75 F.Supp.2d 98, 101 (S.D.N.Y. 1998). In the present case, however, BernzOmatic failed to produce any material evidence of actual confusion by the public and

---

widespread availability of infringing cylinders and therefore does not justify BernzOmatic's request for a mandatory national recall some two years after Worthington ceased selling the infringing product to its retail customers.

instead submitted its case to the jury on a the theory of intentional deception (i.e., that the advertisements were literally false). Under these circumstances, corrective advertising would not be appropriate. See id. (denying corrective advertising remedy when plaintiff presented no material evidence of actual confusion and submitted its infringement claims to jury on theory of intentional deception).

Even if corrective advertising were appropriate in these circumstances, the Court finds that the proposed joint letter would be of little benefit to BernzOmatic at this point. The false advertisements at issue ran a total of four times in one professional publication over two years ago. While BernzOmatic took no action to challenge or correct the false statements in the advertisements at the time, since the conclusion of the trial, BernzOmatic has issued its own corrective advertising in the form of multiple press releases and letters to retail customers describing the outcome of the lawsuit. [See, e.g., Doc. 313-8, March 15, 2010 correspondence to McMaster Carr Supply; Doc. 313-9, March 4, 2010 press release]. BernzOmatic has failed to show that there is any harm that has not already been addressed by its own communications to customers that the proposed joint letter could remedy.

The Court does find, however, that the threatened injury to BernzOmatic's reputation and goodwill outweighs the harm, if any, caused to Worthington as a result of an injunction prohibiting Worthington from illegally infringing BernzOmatic's trade dress or engaging in false advertising in the future. The Court further finds that the public interest would be served by such a prohibitory injunction. <u>See</u> <u>Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.</u>, 43 F.3d 922, 939 (4th Cir. 1995) (holding that an injunction in a trademark infringement case "would serve the public interest by preventing future consumers from being misled"). As all four <u>eBay</u> factors favor entry of an injunction, the Court will enjoin Worthington from infringing BernzOmatic's trade dress and from engaging in false advertising in the future.

## IV.   BERNZOMATIC'S MOTION FOR PREJUDGMENT INTEREST

BernzOmatic moves the Court to amend its Judgment and award prejudgment interest in the amount of $1,827,820 through April 14, 2010, plus $1,425 per day thereafter until an amended judgment is entered. [Doc. 301].

The parties agree that the award of prejudgment interest in this diversity case is governed by Ohio law.  [Doc. 302 at 2; Doc. 316 at 2]. Under Ohio law, prejudgment interest on contract damages is automatic and non-discretionary.  <u>Knott v. Revolution Software, Inc.</u>, 181 Ohio App.3d 519, 530, 909 N.E.2d 702, 711 (2009) ("Once a plaintiff receives judgment on a contract claim, the trial court has no discretion but to award prejudgment interest under R.C. § 1343.03(A).") (citation and internal quotation marks omitted).  Section 1343.03(A) of the Ohio Revised Code provides, in pertinent part, as follows:

> [W]hen money becomes due and payable upon any . . . instrument of writing . . . and upon all judgments . . . of any judicial tribunal for the payment of money arising out of . . . a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code . . . .

Ohio Rev. Code Ann. § 1343.03(A).  With respect to the applicable interest rates pursuant to Ohio Rev. Code § 5703.47, the parties are in agreement that the relevant annual interest rates are 8% for 2007, 8% for 2008, 5% for 2009, and 4% for 2010.  [Doc. 302 at 6; Doc. 316 at 2].

Prejudgment interest "serves ultimately to make the aggrieved party whole" by compensating "for the lapse of time between accrual of the claim

and judgment." <u>Royal Elec. Constr. Corp. v. Ohio State Univ.</u>, 73 Ohio St.3d 110, 117, 652 N.E2d 687, 692 (1995). Accordingly, the amount of prejudgment interest to be awarded is calculated from the time the plaintiff would have obtained or retained the money to the time when judgment is entered. <u>See</u> <u>Local Marketing Corp. v. Prudential Ins. Co.</u>, 159 Ohio App.3d 410, 416, 824 N.E.2d 122, 126 (2004). Thus, prejudgment interest may be calculated using multiple accrual dates. <u>See</u> <u>id.</u> (holding that "the accrual of the claim . . . occurred with each overpayment" under the lease and "interest should therefore be calculated on a monthly basis").

In the present case, the jury awarded BernzOmatic contract damages totaling $13,002,245 -- $1,284,003 for Worthington's unauthorized use of BernzOmatic's trade name, trademarks, and logos, and $11,718,242 for "any other breach of contract." [Jury Verdict, Doc. 293 at 2]. Comparing the amount of damages awarded for "any other breach" to the damages evidence BernzOmatic presented to the jury, BernzOmatic contends that it appears that the jury categorized these contract damages as follows:

| Damages Category | Amount |
| --- | --- |
| Prices Charged Above Contract Level | $ 9,266,366 |
| Failure to Honor Prompt Pay Discount | 280,967[6] |
| Unpaid Rothenberger Royalties (MAPP, MAPP TUV, Propane TUV) | 887,481 |
| Additional Cost of Substitute Cylinders | 1,283,428 |
| **Total Damages for "Other" Breaches** | **$11,718,242** |

[Doc. 302 at 8].

BernzOmatic's expert economist, Dr. Addanki, has submitted a declaration calculating the amount of prejudgment interest to be awarded on each subset of breach of contract damages awarded. For the award of contract damages arising from the unauthorized use of BernzOmatic's trade name, trademarks and logos (a damages figure which reflects the amount of lost profits claimed by BernzOmatic), Dr. Addanki calculated BernzOmatic's lost profits for the relevant time period on a monthly basis and applied the applicable annual interest rates to those amounts using a mid-month convention plus 33 days (to account for the period between invoicing and payment). [Addanki Decl., Doc. 302-6 at ¶8]. Dr. Addanki

---

[6]BernzOmatic sought $561,934 in damages for Worthington's failure to honor the prompt pay discount. BernzOmatic argues that the jury's verdict suggests that it decided to award only fifty percent of this amount, or $280,967. [Doc. 302 at 8].

also used a mid-month convention plus 33 days in calculating the interest to be awarded for the monthly damage calculations for the Prices Charged Above the Contract Level and the Failure to Honor Prompt Pay Discount. [Id. at ¶¶4-5]. In calculating the interest to be awarded for the Unpaid Rothenberger Royalties, Dr. Addanki calculated the amount of each of the royalty payments owed and then applied the applicable annual interest rate, with interest accruing as of the date the payment was due. [Id. at ¶6]. With respect to damages for the Additional Cost of Substitute Coleman Cylinders, Dr. Addanki used a mid-quarter convention plus 33 days. [Id. at ¶7]. Using these methodologies, Dr. Addanki calculates the award of prejudgment interest through April 14, 2010 as follows:

| Damages Category | Interest |
|---|---|
| Prices Charged Above Contract Level | $1,445,513 |
| Failure to Honor Prompt Pay Discount | 43,083 |
| Unpaid Rothenberger Royalties (MAPP, MAPP TUV, Propane TUV) | 99,673 |
| Additional Cost of Substitute Cylinders | 102,272 |
| Unauthorized Use of Trademarks, Logos | 137,278 |
| **Total Prejudgment Interest (through April 14, 2010)** | **$1,827,820** |

[Id. at ¶¶4-9].  Dr. Addanki further opines that prejudgment interest will continue to accrue after April 14, 2010 until the entry of an amended judgment at the rate of $1,425 per day.  [Id. at ¶10].

Worthington objects to several aspects of BernzOmatic's request for prejudgment interest.  It first contends that BernzOmatic's calculation rests upon assumptions regarding the accrual dates that are not supported by any actual data.  [Doc. 316 at 2].  While criticizing Dr. Addanki's approach, Worthington has offered no evidence or legal authority to show that his use of 33-day midpoint conventions was unreasonable.[7]  Nor has Worthington offered any alternative calculation for this award.

While BernzOmatic advocates the adoption of the multiple-accrual-date approach, it contends that the Court alternatively could calculate the award of prejudgment interest using solely the date of the initial breach of the Supply Agreement by Worthington.  See Royal Elec., 73 Ohio St.3d at 117, 652 N.E.2d at 692 (awarding prejudgment interest as of the date that the breach of contract claim accrued).  Using that accrual date, the amount of prejudgment interest to be awarded would be $2,699,124, a figure that is

---

[7]Indeed, Dr. Addanki used the same 33-day convention for calculating BernzOmatic's prompt pay discount damages at trial.  [Doc. 269, Feb. 18, 2010 Trial Transcript at 723-26 (Addanki)].

significantly higher than the amount sought by BernzOmatic in its motion. Thus, while Worthington objects to the use of multiple accrual dates in calculating prejudgment interest, this approach is more beneficial to Worthington than the alternative of using the date of the original breach. For the reasons set forth above, the Court finds that these multiple accrual dates are based on the evidence and provide a fair and reasonable basis for calculating the award of prejudgment in this case.

Worthington next argues that Bernzomatic is not entitled to prejudgment interest on the $1,284,003 awarded to BernzOmatic as "lost profits" because such damages were not monies "due and payable" under the contract. In support of this argument, Worthington cites an unpublished decision of the Ohio Court of Appeals, RPM, Inc. v. Oatey Co., No. 3282-M, 3289-M, 2005 WL 663057 (Ohio Ct. App. Mar. 23, 2005), in which a divided court held that prejudgment interest may be awarded only for "those contracts that provide for a payment of money that the breaching party failed to pay." Id. at *13. The Sixth Circuit has held that the majority opinion in RPM is based on an erroneous interpretation of the Ohio Supreme Court's controlling decision in Royal Electric Construction Corp. v. Ohio State University, 73 Ohio St.3d 110, 652 N.E.2d 687 (1995).

See Tharo Sys., Inc. v. cab Producttechnick GmbH & Co., 196 F. App'x 366 (6th Cir. 2006). As the Sixth Circuit noted in Tharo, "the net effect of the Royal Electric ruling is that prejudgment interest is appropriate in contract claims ... [t]hat is, money damages become due and payable on a contract at the time of the breach." Id. at 377-78. Thus, the fact that Section 4.3 of the Supply Agreement does not identify a specific amount "due and payable" is of no consequence. "The award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." See Royal Elec., 73 Ohio St.3d at 117, 652 N.E.2d at 692. Accordingly, the Court concludes that an award of prejudgment interest on the $1,284,003 damages award is proper.

BernzOmatic contends that it is also entitled to prejudgment interest past the date of the entry of the original judgment in this case. [Doc. 302 at 2]. This argument must be rejected. BernzOmatic is entitled to prejudgment interest only to the date of entry of the original judgment. Upon entry of that judgment, postjudgment interest began to accrue. See

37

28 U.S.C. § 1961(a) (calculating postjudgment interest in federal civil case "from the date of the entry of the judgment"); Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (holding that postjudgment interest runs from the date of entry of judgment). In a case where multiple judgments are entered, postjudgment interest begins to accrue with the entry of the first judgment which "ascertained [damages] in a meaningful way." Skalka v. Fernald Envtl. Restoration Mgmt. Corp., 178 F.3d 414, 429 (6th Cir.1999) (quoting Kaiser, 494 U.S. at 836, 110 S.Ct. 1570) (internal quotation marks and alterations omitted); see also AT&T Co. v. United Computer Sys., Inc., 98 F.3d 1206, 1211 (9th Cir. 1996) (calculating postjudgment interest from date of second judgment on remand where first judgment awarding damages had been vacated). Because BernzOmatic's damages were sufficiently ascertained in the Court's April 14, 2010 Judgment, BernzOmatic is entitled to prejudgment interest only to the date of entry of that Judgment.

For the foregoing reasons, BernzOmatic's motion for prejudgment interest will be granted to the extent that the Judgment will be amended to include an award of prejudgment interest to BernzOmatic in the amount of

$1,827,820.  BernzOmatic's request for prejudgment interest past the date of the entry of the original judgment is denied.

## V.    BERNZOMATIC'S MOTION FOR ATTORNEYS' FEES

BernzOmatic moves for an award of attorneys' fees as a prevailing plaintiff under both the Lanham Act and Chapter 75.  BernzOmatic seeks a total award of $1,241,605 for attorney and paralegal fees and related online research expenses related to its Lanham and Chapter 75 claims.[8]  [Doc. 303 at 1].

### A.    Prevailing Party

In order to be eligible for an award of attorneys' fees under the Lanham Act or Chapter 75, BernzOmatic must be the "prevailing party." For the purposes of 15 U.S.C. § 1117(a), a party is "prevailing" where that party "succeed[s] on a significant litigated issue that achieves some of the benefits sought by that party in initiating the suit."  Montgomery v. Noga, 168 F.3d 1282, 1304-05 (11th Cir. 1999) (affirming award of attorneys' fees to plaintiff who obtained injunction and nominal damages on Lanham Act

---

[8]BernzOmatic only seeks a "fair estimate" of that portion of its fees incurred in connection with the Lanham Act and Chapter 75 claims.  The total amount of attorneys' fees BernzOmatic incurred in connection with this entire litigation, through trial, was $3,660,052, for 11,467 hours of work.  [Doc. 304 at 23].

claim); see also Audi AG v. D'Amato, 469 F.3d 534, 550-51 (6th Cir. 2006) (holding that plaintiff awarded only injunctive relief was prevailing party under Lanham Act).

In order to be considered "prevailing" under Chapter 75, a plaintiff must prove not only that the defendant violated the Act, but also that the plaintiff suffered "an actual injury" as a result of the violation. See Llera v. Sec. Credit Sys., Inc., 93 F.Supp.2d 674, 677-78 (W.D.N.C. 2000); Mayton v. Hiatt's Used Cars, Inc., 45 N.C. App. 206, 212, 262 S.E.2d 860, 864 (1980). An award of $1.00 in damages is sufficient to establish an "actual injury." See Pinehurst, Inc. v. O'Leary Bros. Realty, Inc., 79 N.C. App. 51, 64, 338 S.E.2d 918, 926 (awarding attorneys' fees under Chapter 75 to plaintiff awarded $1.00 in actual damages where evidence showed "defendants' wrongful conduct caused a disruption of their business, loss of administrative time, and injury to their business reputation"), disc. rev. denied, 316 N.C. 378, 342 S.E.2d 896 (1986).

In the present case, the jury was instructed that if it found that BernzOmatic had suffered damages as a result of Worthington's trade dress infringement and/or false advertising, but that BernzOmatic had failed to prove by a preponderance of the evidence the amount of those

damages, the jury could award a nominal sum of damages. [Doc. 288, Feb. 27, 2010 Trial Tr. at 2194]. The jury found that Worthington willfully infringed BernzOmatic's trade dress and willfully engaged in false advertising, thereby proximately causing an injury to BernzOmatic, and awarded damages in the amount of $1.00. [Jury Verdict, Doc. 293 at 3-4]. The Court subsequently trebled this award. [Judgment, Doc. 294 at 4]. Although nominal, this award establishes that BernzOmatic suffered an actual injury as a result of Worthington's Lanham Act/Chapter 75 violations. Additionally, the Court has awarded BernzOmatic permanent injunctive relief under the Lanham Act prohibiting Worthington from engaging in any further trade dress infringement or false advertising regarding its manufacturing history of BernzOmatic's hand torch cylinders. Based on the jury's award of nominal damages and the award of injunctive relief, the Court concludes that BernzOmatic is a "prevailing party" for the purposes of both the Lanham Act and North Carolina's Chapter 75.

## B. Recovery of Fees Under the Lanham Act

The Lanham Act permits the award of reasonable attorneys' fees to a prevailing party "in exceptional cases." 15 U.S.C. § 1117(a). An "exceptional case" warranting attorneys' fees is one in which "the

defendant's conduct was malicious, fraudulent, willful or deliberate in nature." Retail Services, Inc. v. Freebies Publishing, 364 F.3d 535, 550 (4th Cir. 2004) (quoting People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001)). In the Fourth Circuit, a prevailing plaintiff additionally "must show that the defendant acted in bad faith" before attorneys' fees can be awarded. Scotch Whisky Ass'n v. Majestic Distilling Co., 958 F.2d 594, 599 (4th Cir. 1992). Once the Court has determined that a case is "exceptional," the decision to award fees is a matter within the Court's discretion. See Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1480 (Fed. Cir. 1998); Vankwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc., 994 F.Supp. 350, 381 (W.D.N.C. 1997).

In the present case, the jury was instructed on the "malicious, fraudulent, willful or deliberate" standard for willfulness [Doc. 288, Feb. 25, 2010 Trial Tr. at 2194-95], and based on the evidence presented, the jury found that Worthington's trade dress infringement and false advertising were willful. The jury's finding in this regard supports the conclusion that BernzOmatic has satisfied the exceptional case requirement. See Gracie v. Gracie, 217 F.3d 1060, 1068 (9th Cir. 2000) ("Here the jury explicitly found that [defendant] engaged in 'willful' infringement of [plaintiff's] logo.

42

The district court's decision to make a fee award to [plaintiff] thus flows quite naturally from the jury's finding of willful infringement and the legal standard for 'exceptional cases' under § 1117.").

Additionally, the evidence presented at trial supports a finding that Worthington acted in bad faith. Specifically, BernzOmatic presented evidence to show that when Worthington wrongfully terminated the Supply Agreement and decided to sell hand torch cylinders directly to retailers, Worthington abandoned its existing packaging. The new cylinder Worthington introduced to the market looked virtually identical to BernzOmatic's existing cylinder in size, shape, color, and appearance, including a label using the same large black circle (the "Circle of Trust") and font colors and placement as the BernzOmatic label. [Doc. 266, Feb. 17, 2010 Trial Tr. at 223-24 (Morrisroe); Doc. 274, Feb. 19, 2010 Trial Tr. at 930 (McClintock); Plaintiffs' Trial Ex. 93]. Worthington's Vice President of Sales and Marketing, Dustan McClintock, made the decision to change Worthington's label over the objections of his Marketing Manager, Natalie Broadbent, and an outside consultant on branding strategy, Dave Schwantes of b4 Branding. Broadbent and Schwantes advised McClintock

to keep the existing label.  [Plaintiffs' Trial Ex. 36;  Doc. 286, Feb. 23, 2010

Trial Tr. at 1741 (Shakley)].

Worthington then marketed its new hand torch cylinders by providing

retailers with photographs of its cylinders standing side-by-side on retail

shelves with BernzOmatic's cylinders, and describing how the Worthington

labels were "replacing" the nearly-identical BernzOmatic labels.  [See, e.g.,

Doc. 266, Feb. 17, 2010 Trial Tr. at 226-28 (Morrisroe); Plaintiffs' Trial Exs.

39, 40].  Worthington's National Retail Account Manager, Dave Cline,

described the difference between Worthington's new cylinder and

BernzOmatic's cylinder as "subtle to the consumer."  [Plaintiffs' Trial Ex.

37].  In an email to Worthington's President, McClintock described the

subtleness of the label change as "Sweet!"  [Doc. 290, Feb. 24, 2010 Trial

Tr. at 1988 (Goussetis); Plaintiffs' Trial Ex. 127].

The evidence presented at trial further showed that Worthington

created an ad campaign that was designed to trade on the BernzOmatic

name.  The ads pictured a BernzOmatic cylinder with its label being torn

away to reveal a Worthington-labeled cylinder underneath, with the

black circles on the labels lining up in the same position.  [Plaintiffs' Trial

Ex. 13]. Worthington knew that in order for the ad campaign to be effective,

it had to connect Worthington's unknown brand with BernzOmatic's established name and reputation.  [Plaintiffs' Trial Exs. 14, 15].  With the BernzOmatic label displayed on the first panel of the ad, the ads falsely stated that Worthington — not BernzOmatic — had been the "name" that retail stores and consumers had "trusted all along."  [Plaintiffs' Trial Ex. 13]. Worthington's Marketing Manager, Natalie Broadbent, admitted in emails unearthed during discovery that she knew that the statement "the name you've always trusted" was "not accurate."  [Doc. 267, Feb. 18, 2010 Trial Tr. at 552 (Broadbent Video); Plaintiffs' Trial Exs. 14, 15].  Worthington also knew that BernzOmatic -- not Worthington or even its predecessor, Western -- had manufactured its own cylinders until the 1980's.  [Doc. 280, Feb. 22, 2010 Trial Tr. at 1337-38 (Raboin)].

Based on this evidence, and the jury's determination of Worthington's willful trade dress infringement and false advertising, the Court concludes that Worthington acted in bad faith, thus warranting an award of attorneys' fees under the Lanham Act.

### C.    Recovery of Fees Under Chapter 75

An award of attorneys' fees under Chapter 75 is a matter within the Court's discretion.  <u>Shepard v. Bonita Vista Properties, L.P.</u>, 191 N.C. App.

614, 625, 664 S.E.2d 388, 396 (2008).  Under Chapter 75, a prevailing

plaintiff may recover attorneys' fees where (1) the defendant willfully

engaged in the unfair or deceptive trade practice and (2) the defendant

made an unwarranted refusal to settle the matter.  See N.C. Gen. Stat. §

75-16.1.  The Court finds that both of these requirements are satisfied

here.

First, as discussed extensively above, there is ample evidence to

support the jury's determination that Worthington acted willfully in infringing

BernzOmatic's trade dress and engaging in false advertising.  The jury's

finding in this regard satisfies Chapter 75's willfulness requirement for the

recovery of attorneys' fees.  See Leftwich v. Gaines, 134 N.C. App. 502,

519, 521 S.E.2d 717, 729 (finding defendants willfully engaged in deceptive

acts "as found by the jury"), disc. rev. denied, 351 N.C. 357, 541 S.E.2d

713 (1999).

Second, the Court concludes that Worthington's refusal to settle this

matter fully was unwarranted.  Both parties have submitted the declarations

of counsel describing the course of the parties' settlement negotiations

prior to and during trial.  These declarations show that the parties engaged

in their first mediation on May 21, 2009.  At that mediation, Worthington

demanded that BernzOmatic *pay Worthington* $14.5 million. [Declaration of Matthew B. Mock ("Mock Decl."), Doc. 304-18 at ¶5]. By contrast, BernzOmatic demanded $13 million, almost exactly the amount awarded by the jury. [Id.]. The parties concluded the first mediation far apart, and the case proceeded to discovery.

The parties conducted a second mediation on December 9, 2009, one week prior to the Court's grant of summary judgment to BernzOmatic on Worthington's fraudulent inducement counterclaim. At the end of that mediation, Worthington's settlement position was an offer to pay $4 million, and BernzOmatic's demand to resolve the entire case, including the fraudulent inducement counterclaim, was $12.25 million. [Id. at ¶6]. Shortly before trial, the parties engaged in informal settlement discussions. BernzOmatic stood by its December 9, 2009 demand, asking again for $12.25 million. Despite the Court's dismissal of Worthington's $22 million fraud counterclaim -- which substantially decreased Worthington's litigation leverage -- Worthington did not even respond to BernzOmatic's demand. [Id. at ¶8]. During trial, the parties engaged in some very informal discussions, but Worthington never made an actual offer. [Id. at ¶9].

While Worthington vigorously argues that it was *BernzOmatic* that acted unreasonably in refusing to reduce its demand in any meaningful way, it must be noted that the amount of many categories of BernzOmatic's damages – particularly the $9.3 million in contractual overcharges, the $1 million-plus in Rothenberger Royalties, and a significant amount of prejudgment interest on both amounts -- were largely undisputed. Despite this, Worthington's best settlement offer did not approach even half of these undisputed amounts. The Court concludes that Worthington's refusal to fully resolve these claims was unwarranted and thus justifies the award of attorneys' fees in this case pursuant to Chapter 75 as well.[9]

## D.     Calculation of a Reasonable Fee Award

The determination of a reasonable fee award is a matter of discretion with the Court. See Robinson v. Equifax Info. Services, 560 F.3d 235, 243 (4th Cir. 2009). In determining the amount of reasonable attorneys' fees to be awarded, courts typically apply the lodestar method, whereby the Court multiplies the number of reasonable hours expended by a reasonable

---

[9]BernzOmatic contends that an award of attorneys' fees is also appropriate based on Worthington's conduct during the course of this litigation, particularly during discovery. The Court declines to make such a finding. While this was an aggressively litigated case, particularly by Worthington, the Court cannot say that Worthington's conduct was so egregious as to serve as a separate justification for the imposition of attorneys' fees in this case.

hourly rate.  Id..  The party seeking an award of attorneys' fees has the

burden of demonstrating a reasonable fee.  Hensley v. Eckerhart, 461 U.S.

424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

### 1.    Number of Hours Reasonably Expended

A party seeking an award of attorneys' fees must "state the amount

sought or provide a fair estimate of it."  Fed. R. Civ. P. 54(d)(2)(B)(iii).  In

the present case, BernzOmatic estimates that prior to the Court's summary

judgment ruling on December 16, 2009, approximately 25% of its attorneys'

time was spent on the Lanham Act and Chapter 75 claims, and that

following the Court's summary judgment ruling, the amount of attorney time

devoted to these claims increased to approximately 50%.

Upon careful review of the record, it is evident that the time spent

prosecuting BernzOmatic's Lanham Act and Chapter 75 claims was

necessarily intertwined with time spent on BernzOmatic's other claims.  For

example, in discovery almost every witness had knowledge and testified at

deposition about Worthington's advertising, trade dress, or acts underlying

BernzOmatic's Chapter 75 claim.  These issues also overlapped in terms of

written discovery and document review.  The proportion of BernzOmatic's

attorneys' time spent on the Lanham Act and Chapter 75 claims increased

after the Court's summary judgment ruling on December 16, 2009, when the Court eliminated some of BernzOmatic's other tort claims as well as Worthington's fraudulent inducement counterclaim. In light of the foregoing, the Court concludes that BernzOmatic's estimates of the amount of attorney and paralegal time spent on the Lanham Act and Chapter 75 claims, both before and after the summary judgment ruling, are reasonable. See Gracie, 217 F.3d at 1069-70 (holding that district court should attempt to apportion Lanham Act-related fees "unless the court finds the claims are so inextricably intertwined that even an estimated adjustment would be meaningless"); Lapierre v. Samco Dev. Corp., 103 N.C. App. 551, 562, 406 S.E.2d 646, 651 (1991) (accepting attorneys' estimate that one-third of time was spent on claims eligible for fee award).

The Court, however, will not award the $45,477 in fees claimed by BernzOmatic for the 340 hours worked by "project assistant" Crystal Pyatt. While BernzOmatic contends that Ms. Pyatt "participated in all aspects of discovery, motion practice, summary judgment, trial preparation, and trial" [Declaration of Matthew C. Crowl ("Crowl Decl."), Doc. 304-20 at ¶27], there is nothing in the record to show that she has any legal training or background or that she provided any legal services related to this case. As

such, she appears to be much more akin to a legal secretary or legal assistant, whose pay would be considered overhead for the firm. See Bridgeport Music, Inc. v. Irving Music, Inc., No. 3:01-1150, 2008 WL 2437665, at *5 (M.D. Tenn. June 16, 2008).

### 2. Reasonable Hourly Rates

#### a. Rates Sought by BernzOmatic Attorneys and Paralegals

In support of its request for attorneys' fees, BernzOmatic has submitted the declarations of attorneys Matthew C. Crowl and Robert A. Muckenfuss. [Docs. 304-20 to 304-23]. These declarations provide the following information regarding BernzOmatic's litigation team.

Attorney Matthew C. Crowl served as lead trial counsel for BernzOmatic in this case. Mr. Crowl is a partner at the law firm of Schiff Hardin LP in Chicago, Illinois, and has held that position since 2006. His practice is focused on civil litigation, internal investigations, white collar crime matters, corporate compliance, and business disputes. He has been admitted to practice in Illinois since 1989 and has been admitted to the bar of the United States District Court for the Northern District of Illinois and the United States Court of Appeals for the Seventh Circuit. Throughout this litigation, Mr. Crowl charged BernzOmatic a discounted hourly rate of $480

to $505.  Through trial, Crowl billed a total of 915 hours, of which BernzOmatic seeks reimbursement for 359 hours, amounting to fees of $180,757.  [Crowl Decl., Doc. 304-20 at ¶¶2, 20].

Attorney Robert A. Muckenfuss served as local counsel for BernzOmatic.  Mr. Muckenfuss is a partner of McGuireWoods LLP in Charlotte, North Carolina, with thirteen years of experience.  He was admitted to practice in North Carolina in 2001 and also has been admitted to the bars of South Carolina, the United States District Courts for the Western District of North Carolina, the Middle District of North Carolina, the Eastern District of North Carolina, the District of South Carolina, as well as the United States Court of Appeals for the Fourth Circuit.  His practice focuses on complex commercial litigation and financial services litigation. Throughout this litigation, his discounted hourly rate charged to BernzOmatic was $356 to $460.  Through trial, he billed a total of 345 hours.  BernzOmatic seeks reimbursement for 146 of those hours, amounting to fees of $62,949.  [Declaration of Robert A. Muckenfuss ("Muckenfuss Decl."), Doc. 304-23 at ¶¶2, 3, 8].

Attorney Matthew B. Mock is a partner at Schiff Hardin, with over nine years of litigation experience.  His practice focuses on complex commercial

disputes, antitrust and trade regulation, and white collar criminal defense. He is licensed to practice in Illinois and has been admitted to the bars of the United States District Courts for the North and Central Districts of Illinois as well as the Seventh Circuit Court of Appeals. Mr. Mock managed all aspects of the present lawsuit from the drafting and filing of the complaint, through discovery, motion practice, summary judgmnet, and trial. Throughout this litigation, Mr. Mock charged BernzOmatic a discounted hourly rate of $380 to $415. Through trial, he billed a total of 2,348 hours, of which BernzOmatic seeks reimbursement for 757 hours, amounting to fees of $310,801. [Crowl Decl., Doc. 304-20 at ¶21].

David C. Scott is an associate at Schiff Hardin, with over six years of litigation experience. He is licensed to practice in Illinois, and also has been admitted to the bars of the United States Courts of Appeals for the Fourth Circuit, Fifth Circuit, Tenth Circuit, and Eleventh Circuit, as well as the United States District Courts for the District of Colorado, the Northern District of Illinois, and the Eastern District of Wisconsin. Mr. Scott participated in all aspects of this lawsuit from the drafting and filing of the complaint, through discovery, motion practice, summary judgment, and trial. His discounted hourly rate in this case was $305 to $325. Through

trial, he billed a total of 1,997 hours, of which BernzOmatic seeks reimbursement for 676 hours, amounting to fees of $218,141.  [Id. at ¶22].

Shelley L. Merkin is an associate at Schiff Hardin with over two years of litigation experience.  Ms. Merkin is licensed to practice in Illinois and has also been admitted to the bar of the United States District Court for the Northern District of Illinois.  She joined the BernzOmatic core litigation team near the end of discovery and assisted with summary judgment, trial preparation, motions in limine, preparation for the pretrial conference, and trial.  Her discounted hourly rate in this case was $290 to $297.  Through trial, she billed a total of 612 hours, of which BernzOmatic seeks reimbursement for 284 hours, amounting to fees of $84,412.  [Id. at ¶23].

Douglas G. Snodgrass is also an associate at Schiff Hardin with approximately two years of experience.  Mr. Snodgrass is licensed to practice in Illinois, and also has been admitted to the bar of the United States District Court for the Northern District of Illinois.  He joined the BernzOmatic core litigation team shortly after the complaint was filed, and participated in all aspects of discovery, motion practice, summary judgment, trial preparation, and trial.  His discounted hourly rate in this case was $260 to $277.  Through trial, he billed a total of 2076 hours, of

which BernzOmatic seeks reimbursement for 665 hours, amounting to fees of $180,339.  [Id. at ¶24].

Jeannice D. Williams is also an associate at Schiff Hardin with two years of experience.  Ms. Williams is licensed to practice in Illinois.  She joined the BernzOmatic core litigation team shortly before trial and assisted with trial preparation and trial.  Her discounted hourly rate in this case was $279.  Through trial, she billed a total of 274 hours, of which BernzOmatic seeks reimbursement for 137 hours, amounting to fees of $38,292.  [Id. at ¶25].

BernzOmatic also seeks recovery of certain fees charged by Art Mitzel, Jennifer B. Sawtell, and Cathy L. Stewart.  Mr. Mitzel, a paralegal with Schiff Hardin, has over twenty years of experience and participated in all aspects of this lawsuit from the complaint through the trial.  His discounted hourly rate in this case was $210 to $234.  Through trial, he billed a total of 1,000 hours, of which BernzOmatic seeks reimbursement for 390 hours, amounting to fees of $90,923.  [Id. at ¶26].

Ms. Sawtell is a paralegal with McGuire Woods.  Her discounted hourly rate in this case was $181 to $204.  Through trial, she billed a total

of 42 hours, of which BernzOmatic seeks reimbursement for 10 hours,

amounting to fees of $2,099.  [Muckenfuss Decl., Doc. 304-23 at ¶¶5, 9].

Ms. Stewart is also a paralegal with McGuire Woods.  Her discounted

hourly rate in this case was $176 to $181.  Through trial, she billed a total

of 51 hours, of which BernzOmatic seeks reimbursement for 23 hours,

amounting to fees of $4,233.  [Id. at ¶¶5, 10].

### b.    Prevailing Market Rates

As the Fourth Circuit has recognized:

> [D]etermination of the hourly rate will generally be the
> critical inquiry in setting the reasonable fee, and the
> burden rests with the fee applicant to establish the
> reasonableness of a requested rate. *In addition to the*
> *attorney's own affidavits, the fee applicant must*
> *produce satisfactory specific evidence of the*
> *prevailing market rates in the relevant community for*
> *the type of work for which he seeks an award.*
> Although the determination of a market rate in the
> legal profession is inherently problematic, as wide
> variations in skill and reputation render the usual laws
> of supply and demand largely inapplicable, the Court
> has nonetheless emphasized that market rate should
> guide the fee inquiry.

Robinson, 560 F.3d at 244 (quoting Plyler v. Evatt, 902 F.2d 273, 277 (4th

Cir. 1990) (emphasis in Robinson).  In the absence of specific evidence

regarding the prevailing market rate, the Court may establish a reasonable

rate based upon its own knowledge and experience of the relevant market,

which in this case would be the Charlotte, North Carolina area. See Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 179 (4th Cir 1994) ("[T]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.").

To establish the prevailing market rate, BernzOmatic relies on the Declaration of attorney Timothy G. Barber. Mr. Barber has been a partner in the Charlotte office of King & Spalding since 2009. Prior to that date, he practiced with Womble Carlyle Sandridge & Price, PLLC ("Womble") for 24 years. [Declaration of Timothy G. Barber ("Barber Decl."), Doc. 304-24 at ¶1]. His practice focuses on complex commercial litigation, including cases involving shareholder dispute and class actions, securities fraud, patent litigation, as well as numerous cases arising under the Lanham Act and Chapter 75. [Id. at ¶3]. From 1998 to 2006, he served as the practice group leader for Womble's business litigation practice group. From 2007 to 2009, he was the group leader for the firm's intellectual property litigation group. As practice group leader, one of Mr. Barber's responsibilities was to make annual recommendations of hourly billing rates for all attorneys, paralegals, and project assistants in his group. To carry out this responsibility, Mr. Barber reviewed periodic data regarding billing rates in

North Carolina. [Id. at ¶¶4, 5]. Mr. Barber also was involved in recruiting and evaluating potential lateral candidates employed by other North Carolina firms. This evaluation included analysis of the candidate's hourly billing rate in relation to the complexity of his or her practice. Such evaluation added to Mr. Barber's knowledge of billing rates in North Carolina. [Id. at ¶6]. As senior member of the litigation team at King & Spalding's Charlotte office, Mr. Barber continues to monitor billing rates throughout North Carolina. [Id. at ¶7].

Mr. Barber states in his Declaration that upon his review of the declarations of Mr. Crowl and Mr. Muckenfuss, and based on his own experience, it is his opinion that the hourly rates charged by all of BernzOmatic's attorneys and paralegals "are well within the prevailing market rates for attorneys and paralegals of similar education, training and experience in Charlotte" and that "the increase in the rates from 2008 until trial is in line with the increase in billing rates in this area over that same time period." [Id. at ¶11].

Worthington contends that the hourly rates charged by BernzOmatic's attorneys and paralegals are unreasonable and are not in keeping with the prevailing market rates. [Doc. 315 at 24-25]. In support of

its argument, Worthington submits the Declaration of E. Fitzgerald Parnell, III, a partner in North Carolina law firm Poyner Spruill LLP and past president of the North Carolina State Bar.  [Declaration of E. Fitzgerald Parnell, III ("Parnell Decl."), Doc. 315-3 at ¶¶2, 3].  Mr. Parnell is of the opinion that the rates charged by BernzOmatic's counsel "are significantly above the rates many fine lawyers in North Carolina would be happy to be paid for federal trial work."  [Id. at ¶15].  He further notes that his own discounted hourly rate is $285, which is slightly lower than the discounted rates claimed by Schiff Hardin's associates.  [Id.].

The Court finds it telling that Mr. Parnell does not offer what his regular hourly rate is.  Nor has any of Worthington's attorneys offered to disclose what hourly rate they have charged to their client throughout this litigation.  Moreover, Mr. Parnell's opinion as to what "many fine lawyers ... would be happy to be paid" begs the question of what the prevailing market rate is for attorneys having experience and expertise comparable to that of BernzOmatic's attorneys.  Nevertheless, the Court agrees with Worthington that the hourly rates claimed by BernzOmatic's attorneys are in excess of the prevailing market rates in the Charlotte community for this type of litigation.  Based upon the Court's own knowledge and experience of the

relevant market, the Court therefore will base the attorney's fee award to BernzOmatic upon the following reduced rates:

| | |
|---|---|
| Matthew C. Crowl | $400 |
| Robert A. Muckenfuss | $340 |
| Matthew B. Mock | $325 |
| David C. Scott | $280 |
| Associates (Merkin, Snodgrass & Williams) | $225 |
| Paralegals (Mitzel, Sawtell & Stewart) | $ 75 |

The Court finds that these adjusted rates are commensurate with the market rates prevailing in the Charlotte community "for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Hadix v. Johnson</u>, 65 F.3d 532, 536 (6th Cir. 1995) (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 896 n.11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

### 3.    Calculation of Lodestar Amount

In determining what constitutes a "reasonable" fee, the Fourth Circuit has instructed that a district court's discretion should be guided by the following factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required

to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Grissom v. The Mills Corp., 549 F.3d 313, 321 (4th Cir. 2008) (quoting

Spell v. McDaniel, 824 F.2d 1380, 1402 n.18 (4th Cir. 1987)).  As the

Fourth Circuit has noted, "the most critical factor in determining the

reasonableness of a fee award is the degree of success obtained."  Doe v.

Chao, 435 F.3d 492, 506 (4th Cir. 2006) (quoting Farrar v. Hobby, 506 U.S.

103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)).

### a. Time and Labor Expended

This was a complex case that lasted over a year and a half and

involved numerous highly factual claims and issues.  The parties took more

than 30 depositions in multiple states and collected, reviewed, and

produced hundreds of thousands of documents.  This case also involved

substantial motion practice, including motions to dismiss, motions to

compel, summary judgment motions, and 16 motions in limine.  The

summary judgment and pretrial hearings each lasted a full day, and trial lasted eight days.

### b. Novelty and Difficulty of Questions Raised

BernzOmatic's trade dress infringement and false advertising claims under the Lanham Act and Chapter 75 were both novel and difficult. These claims required BernzOmatic to establish, among other things, Worthington's intent to copy BernzOmatic's products, intent to publish false ads, and to trade on its trade name, history, and goodwill. Uncovering evidence of Worthington's true intentions required searching through thousands of documents and deposing numerous Worthington employees and former employees.

### c. Skill Required to Perform Legal Services

In light of the complexity of BernzOmatic's Lanham Act and Chapter 75 claims, Worthington's own attorneys' high level of skill, and the overall aggressiveness that both sides demonstrated in litigating these claims, properly performing the legal services required in this case demanded hard work and a high degree of skill from BernzOmatic's attorneys.

### d.    Opportunity Costs of Litigation

BernzOmatic's attorneys were unable to work on numerous other cases and projects in order to litigate BernzOmatic's claims.  Moreover, as discussed above, BernzOmatic's attorneys charged discounted rates in this case.  Thus, the attorneys' opportunity costs include the higher rates they would have otherwise charged in other cases and projects.

### e.    Customary Fee for Similar Work

Although BernzOmatic's attorneys charged discounted rates, the Court finds these reduced rates are still in excess of the prevailing rates in the Charlotte community and therefore has reduced them accordingly.

### f.    Attorneys' Expectations at Outset of Litigation

It is evident that BernzOmatic's attorneys believed from the outset of this litigation they had a strong case against Worthington, but that they were also aware of the risks involved and did not believe Worthington's liability was a foregone conclusion.  With the uncertain outcome and risks in mind, BernzOmatic's attorneys attempted to settle this case but were unable to do so.

### g.    Time Limitations Imposed

This factor is not applicable here.

### h.    Amount in Controversy

While BernzOmatic was awarded only nominal damages with respect

to the Lanham Act and Chapter 75 claims, BernzOmatic also has been

awarded an injunction prohibiting Worthington from engaging in any further

false advertising and/or trade dress infringement.  Thus, while

BernzOmatic's actual damages are relatively small[10], it has received a

substantial benefit from the entry of the judgment in this case.

### i.    Experience, Reputation, and Ability of Attorneys

As summarized above, BernzOmatic employed several highly skilled

and capable attorneys to represent it in this action.

### j.    Undesirability of Case

This factor is not applicable here.

---

[10]It should be noted, however, that the jury also awarded BernzOmatic $1,284,003 for breach of contract "arising from Worthington's use of Bernzomatic's trade name, trademarks, and logos without BernzOmatic's authorization." [Verdict Sheet, Doc. 293 at 2].  As the jury was instructed that it was not to award duplicative damages, it is entirely conceivable that the jury found that Worthington's unauthorized use of BernzOmatic's trade dress -- i.e., the BernzOmatic *logo* -- was fully accounted for in the jury's award for this breach of contract.  See, e.g., The Post Office v. Portec, Inc., 913 F.2d 802, 812 (10th Cir. 1990) (vacated on other grounds) (noting that jury did not award damages under Lanham Act "apparently because it felt that plaintiff would be adequately compensated by the jury's award of actual damages" on related misappropriation of trade secrets claim).

### k. Nature and Length of Attorney-Client Relationship

Schiff Hardin has represented BernzOmatic's corporate parent, Newell Rubbermaid, since 1978 and has represented BernzOmatic since it became a part of the Newell Rubbermaid family of companies in 1982. Schiff Hardin has represented Newell Rubbermaid and BernzOmatic in over 1,300 matters. Due to this long-standing relationship, all of Schiff Hardin's charges were made to BernzOmatic at discounted hourly rates. [Crowl Decl., Doc. 304-20 at ¶¶14, 19].

### l. Fee Awards in Similar Cases

Given the complexity of Lanham Act cases, it is not entirely uncommon for courts to award more in attorneys' fees than the prevailing party recovered as damages. See, e.g., The Post Office, 913 F.2d at 811-12 (affirming award of over $619,000 in attorneys' fees even though the jury awarded no damages on the plaintiff's Lanham Act claim); Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield, Nos. 91-4159, 92-3079, 92-3043 and 91-4160, 1992 WL 393577, at *1 (6th Cir. Dec. 29, 1992) (affirming award of $2.5 million in attorneys' fees where party received $500,000 in damages on Lanham Act claim); Marche Design, LLC v. TwinPro Int'l Holdings Ltd., No. 08-CV-2108-CM/JPO, 2009 WL 37386,

65

at *4 (D. Kan. Jan. 6, 2009) (awarding nearly $50,000 in attorneys' fees after plaintiff received injunctive relief, but no damages, on Lanham Act claim); <u>Manufacturers Techs., Inc. v. Cams, Inc.</u>, 728 F.Supp. 75, 85-86 (D. Conn. 1989) (awarding attorneys' fees despite lack of Lanham Act damages); <u>see also</u> <u>United Labs., Inc. v. Kuykendall</u>, 102 N.C. App. 484, 487-88, 403 S.E.2d 104, 107 (1991) (awarding $250,000 in attorneys' fees in a Chapter 75 case in which the jury returned a verdict of $115,000).

After consideration of the above factors, the Court concludes that the lodestar figure results in a reasonable fee for these claims. Multiplying the estimate of reasonable hours expended by the discounted rates set forth above, the Court calculates the lodestar figure as follows:

| | | |
|---|---|---|
| Crowl | $400/hour x 359 hours | $143,600 |
| Muckenfuss | $340/hour x 146 hours | 49,640 |
| Mock | $325/hour x 757 hours | 246,025 |
| Scott | $280/hour x 676 hours | 189,280 |
| Merkin | $225/hour x 284 hours | 63,900 |
| Snodgrass | $225/hour x 665 hours | 149,625 |
| Williams | $225/hour x 137 hours | 30,825 |
| Mitzel | $75/hour x 390 hours | 29,250 |

| | | |
|---|---|---|
| Sawtell | $75/hour x 10 hours | 750 |
| Stewart | $75/hour x 23 hours | <u>1,725</u> |
| **Total Fee Award** | | **<u>$904,620</u>** |

Accordingly, the Court will award BernzOmatic a total of $904,620 in attorneys' fees as the prevailing party on its Lanham Act and Chapter 75 claims.

### 4. Online Research Expenses

Using the same 25/50% estimate used above, BernzOmatic seeks to recover a total of $23,178 for electronic research expenses. The billing records submitted in support of BernzOmatic's motion reflect that these expenses were charged directly to BernzOmatic separate and apart from the attorneys' hourly fees. [<u>See</u> Crowl Decl., Doc. 304-20, Group Ex. 3].

The Fourth Circuit has not addressed the issue of whether electronic research expenses are recoverable as part of an attorneys' fee award. The majority of circuit courts have concluded that such expenses are generally recoverable if they are customarily charged to the firm's clients as a separate disbursement. <u>See</u> <u>Trustees of the Constr. Indus. and Laborers Health and Welfare Trust v. Redland Ins. Co.</u>, 460 F.3d 1253, 1258-59 (9th Cir. 2006); <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of</u>

Albany, 369 F.3d 91, 98 (2d Cir. 2004); InvesSys, Inc. v. McGraw-Hill Cos.,

369 F.3d 16, 22 (1st Cir. 2004); Role Models Am., Inc. v. Brownlee, 353

F.3d 962, 975 (D.C. Cir. 2004); Case v. Unified Sch. Dist. No. 233, 157

F.3d 1243, 1257-58 (10th Cir. 1998); Uniroyal Goodrich Tire Co. v. Mutual

Trading Corp., 63 F.3d 516, 526 (7th Cir. 1995); but see Standley v.

Chilhowee R-IV Sch. Dist., 5 F.3d 319, 325 & n.7 (8th Cir. 1993)

("computer-based legal research must be factored into the attorneys' hourly

rate, hence the cost of computer time may not be added to the fee award").

   In the past, online research services such as Westlaw and Lexis

charged law firms by the minute for their services.  By identifying a

particular client for a given research session, law firms could track the

costs incurred per client and then bill this amount directly to the client as a

separate disbursement.  Recently, however, it has become much more

common for both Westlaw and Lexis to charge law firms a flat monthly fee

for unlimited access to their online research services.  This change in

billing practice causes the Court to question whether such expenses can

properly be allocated to a particular client as a separate disbursement.

See InvesSys, 369 F.3d at 23 n.5 (allowing costs for electronic research

but noting "[a] different problem would be presented if the firm paid a flat

monthly fee to Westlaw or Lexis and then allocated amounts among clients; similarly, any markup by the firm would raise questions"). Additionally, the Court notes that it is the practice in this District not to award costs for computer aided legal research. <u>See</u> LCvR 54.1(G)(6).

In the absence of any controlling authority mandating the award of such expenses, and in light of this District's practice of disallowing such costs, the Court in its discretion declines to award BernzOmatic expenses incurred by its attorneys in performing online research.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Judgment as a Matter of Law or for New Trial [Doc. 306] is **DENIED**.

**IT IS FURTHER ORDERED** that BernzOmatic's Motion for Entry of a Permanent Injunction [Doc. 299] is **GRANTED** to the extent that the Defendants Worthington Cylinders Wisconsin, LLC and Worthington Cylinder Corp., and their officers, agents, servants, employees, affiliates, successors, and assigns, and any and all persons acting in concert or

participation with them who receive actual notice of this Order (collectively "Worthington") are hereby enjoined and restrained as follows:

(1)     Worthington shall refrain from infringing BernzOmatic's trade dress and engaging in false advertising, both as found by the jury in this case, in violation of the Lanham Act and N.C. Gen. Stat. § 75-1.1.  Specifically, Worthington shall refrain from making, using, inducing someone else to make or use, importing, selling, or offering to sell any blue propane hand torch fuel cylinders that infringe BernzOmatic's protectable trade dress, most notably such cylinders with labels incorporating a black circle similar to BernzOmatic's black "Circle of Trust" logo, and from trading on BernzOmatic's protectable trade dress by advising any customer or potential customer of the similarity between the total image of Worthington's hand torch cylinder product and the total image of any current or former BernzOmatic hand torch cylinder product.

(2)     Worthington also shall refrain from advertising or marketing hand torch fuel cylinders by making false statements or claims in any advertising that Worthington has been the

"name" that BernzOmatic customers have "trusted all along"; that Worthington cylinders have "always" been BernzOmatic customers' "first choice"; that Worthington has been "the fuel behind the [BernzOmatic] flame for over 43 years"; and that Worthington is the "true source" for BernzOmatic hand torch fuel cylinders.

**IT IS FURTHER ORDERED** that BernzOmatic's Motion to Set Amount of Prejudgment Interest and Amend the Judgment Accordingly [Doc. 301] is **GRANTED**, and the Judgment [Doc. 294] is hereby **AMENDED** to include an award of prejudgment interest to BernzOmatic in the amount of One Million, Eight Hundred and Twenty-Seven Thousand, Eight Hundred and Twenty Dollars ($1,827,820.00) through the date of the entry of the original Judgment in this matter on April 14, 2010. BernzOmatic's Motion for the award of prejudgment interest after that date is **DENIED**.

**IT IS FURTHER ORDERED** that BernzOmatic's Rule 54(d) Motion for Attorneys' Fees [Doc. 303] is **GRANTED**, and the Judgment [Doc. 294] is hereby **AMENDED** to include an award of attorneys' fees and expenses to BernzOmatic in the amount of Nine Hundred and Four Thousand, Six Hundred and Twenty Dollars ($904,620.00).

**IT IS SO ORDERED.**

Signed: October 1, 2010

Martin Reidinger
United States District Judge